### PENNSYLVANIA STATE POLICE, BUREAU OF LIQUOR CONTROL ENFORCEMENT

v.

### CAN, INC., Appellant.

Commonwealth Court of Pennsylvania.

Argued Sept. 22, 1994.

Decided Dec. 15, 1994.

Reargument Denied Feb. 7, 1995.

---

Gary Lysaght, for appellant.

Thomas M. Ballaron, Asst. Counsel, for appellee.

Before COLINS, President Judge, FRIEDMAN, J., and KELTON, Senior Judge.

KELTON, Senior Judge.

Can, Inc. (Can) appeals from the July 7, 1993 order of the Court of Common Pleas of Cumberland County (trial court) affirming the decision of the Pennsylvania Liquor Control Board (Board) dismissing Can's appeal from a 120-day liquor license suspension and $1000.00 fine. We affirm.

In October of 1990, Pennsylvania State Trooper Diane Stackhouse (Trooper Stackhouse) initiated an undercover investigation of Can, trading as Johnnie's Cafe, at 201 Enola Road, East Pennsboro Township, Cumberland County. Trooper Stackhouse frequented the bar several times per week in order to get acquainted with the patrons and to become a "regular."

From November 8, 1990 until August 27, 1991, Trooper Stackhouse initiated approximately thirty drug transactions either in or on the licensed premises of Johnnie's Cafe. At least seven of those transactions involved employees, either on or off duty. During the course of her investigation, Trooper Stackhouse observed several incidents of unusual behavior that led her to believe that drug activity was occurring on the premises. This behavior consisted of both patrons and em-ployees frequently entering and leaving the bathrooms, an unusually high number of telephone calls involving both the pay telephone and the one under the bar, frequent exiting of the bar by certain individuals and smoking of marijuana cigarettes or bowls along the side of the building or in the parking lot. Further, Trooper Stackhouse reported overhearing drug-related conversations just about every time she went into the licensed premises.

As a result of Trooper Stackhouse's investigation, the Bureau of Liquor Control Enforcement (Bureau) issued Can a February 13, 1992, two-count citation,[1] therein charging it with violating Section 471 of the Liquor Code (Code)[2] and Section 780–101 of The Controlled Substance, Drug, Device and Cosmetic Act.[3] In essence, the Bureau charged Can with aiding, abetting or engaging in drug-related activities both on and contiguous to the licensed premises.

On January 22, 1992, Bureau employee Mr. Daniel Khalil took two notice of violation letters properly addressed to Can to the Colonial Park Post Office. One was to be sent by regular mail and the other by certified mail. (R.R. 8a–10a.) Through no fault of the Bureau's, the Post Office delivered both to the incorrect address of 251 Enola Road, another licensed premises serviced by the same postal carrier, as opposed to the correct 201 Enola Road address. (Original Record at 321–22.) Thus, Mr. Richard Nott, the active owner of the premises, never received the notices. He did, however, finally receive a citation from the Bureau on February 15, 1992. (Original Record at 48.)

After a hearing, the Administrative Law Judges (ALJs) ordered him to pay a $1000.00 fine and suspended the liquor license of Johnnie's Cafe for 120 days. Mr. Nott appealed that order to the Board, but it affirmed the ALJs' decision.

Mr. Nott then filed an appeal before the trial court, arguing that the passage of more than thirty days between the end of the

---

**1.** The Administrative Law Judges subsequently merged the two counts.

**2.** Act of April 12, 1951, P.L. 90, *as amended,* 47 P.S. § 4–471(b).

**3.** Act of April 14, 1972, P.L. 233, *as amended,* 35 P.S. § 780–101.

Bureau's investigation and his receipt of the citation notifying him of the violations violated Section 471(b) of the Code, 47 P.S. § 4-471(b), which provides that "[n]o penalty provided by this section shall be imposed for any violations provided for in this act unless the bureau notifies the licensee of its nature within thirty days of the completion of the investigation."

The trial court concluded that evidence was adduced at the hearing that the Bureau complied with the notice requirements of Section 471(b) of the Code, 47 P.S. § 4-471(b). Counsel stipulated that the address on the letter was Nott's correct address (Original Record at 83) and the court noted that the failure of Nott to receive the certified mail was not due to any error on the part of the Bureau, but instead, the Post Office.

In response to Nott's argument that there were no facts presented indicating that he should have known anything illegal was occurring in his bar, the trial court noted that "violations of criminal laws other than the Liquor Code may constitute sufficient cause for revocation or suspension of a liquor license." *Pennsylvania Liquor Control Board v. TLK, Inc.*, 518 Pa. 500, 504, 544 A.2d 931, 933 (1988). The trial court concluded that there was sufficient evidence of record to indicate that Nott should have known about the drug activities occurring on his premises.

In response to Nott's argument that the tribunals failed to seriously consider his efforts to prevent illegal drug activity, the trial court noted that, once it is determined that the licensee should have known of the misconduct on the licensed premises, the burden shifts to him to prove that he took substantial affirmative measures to prevent it. Given the fact that there was evidence presented that Nott should have known illegal drug activities were occurring prior to being issued the citation and that he took no remedial measures, the trial court concluded that the tribunals did not abuse their discretion in determining that Nott's efforts after learning of the activity did not constitute "substantial affirmative measures."

## Issues

There are four issues before us for review: 1) whether *Pennsylvania State Police, Bureau of Liquor Control Enforcement v. Cantina Gloria's Lounge, Inc.*, 536 Pa. 254, 639 A.2d 14 (1994), decided subsequent to the trial court's decision, should be applied retroactively to the present appeal; 2) whether the Board erred in determining that Nott was notified of the violation in compliance with Section 471 of the Code; 3) whether the Board erred in determining that Nott should have known that drug-related activities were occurring on the licensed premises; and 4) whether the Board erred in determining that Nott failed to prove that his actions constituted substantial affirmative steps to prevent any illegal activity on the licensed premises.

## Discussion

### 1. Effect of *Cantina Gloria's:*

On June 23, 1994, we granted the Bureau's requested leave to file a supplemental brief in which to present its argument that the holding in *Cantina Gloria's* should not be applied retroactively. In that case, the Supreme Court reversed our unreported memorandum opinion and order and held that trial courts are still required to conduct *de novo* review and, in the exercise of their statutory discretion, to make their own findings of fact and conclusions. Based upon their *de novo* review, they may sustain, alter, change, modify or amend the Board's actions whether or not they make findings which are materially different from those found by the Board. *Cantina Gloria's*, (citing *Adair v. Liquor Control Board*, 519 Pa. 103, 546 A.2d 19 (1988)).

Here, the trial court denied Can's request for a *de novo* hearing (Original Record at 38) and proceeded to limit its review to determining whether the findings of fact are supported by substantial evidence, whether an error of law was committed and whether there was an abuse of discretion. *See In re Appeal of Iggy, Inc.*, 140 Pa.Commonwealth Ct. 168, 592 A.2d 122 (1991) (In *Cantina Gloria's*, the Supreme Court disavowed our scope of review analysis in *Iggy* and declared that the *de novo* review was correct.)

■ The Bureau argues that *Cantina Gloria's* should not be applied retroactively because Nott failed to preserve that issue on appeal to this Court. The Bureau points out that Nott raised the "scope of review" issue before the trial court and filed a brief in support thereof (Original Record at 520–30), but notes that Can failed to pursue that issue before our Court on appeal.[4]

■ We agree that Nott failed to raise that issue on appeal before this Court. Accordingly, we conclude that it was waived and that *Cantina Gloria's* should not be applied retroactively on appeal in this case. Pa.R.A.P. 302(a).

### 2. Notice under Section 471 of the Liquor Code:

■ Section 471 of the Code provides that "[n]o penalty provided by this section shall be imposed for any violations provided for in this act unless the bureau notifies the licensee of its nature within thirty days of the completion of the investigation." 47 P.S. 4–471(b). Here, the investigation was completed on January 10, 1992 and Nott received notice on February 15, 1992. (Original Record at 48.)

Nott argues that, because the notice requirement is mandatory, the Bureau's failure to comply renders the citation fatally defective and requires its dismissal. He contends that it is irrelevant that the mistake here was made by the Post Office and not the Bureau.

The Bureau contends that it provided notice to Nott in accordance with standard procedure and that its actions of correctly addressing and timely mailing the notice of violation letters were reasonably calculated to provide notice to the licensee. It argues that actual notice is not required and that the Bureau cannot be held responsible for the errors of the Post Office.

The Bureau further argues that there are no due process issues here because Nott acknowledged receipt of the February 13, 1992 citation, which specifies the behavior alleged to violate the Code, and had an adequate opportunity to prepare and present his defenses. Thus, Nott has not been prejudiced here by his alleged failure to have received the notice of violation letter, which serves the limited purpose of providing a licensee with warning that his activities have been under investigation and that his license may be in danger.

Several cases are noteworthy. In *Slovak–American Citizens Club of Oakview v. Pennsylvania Liquor Control Board*, 120 Pa.Commonwealth Ct. 528, 536, 549 A.2d 251, 255 (1988), we held as follows:

Remission of notice by certified mail is sufficient compliance although notice is returned unclaimed and a second notice is never received. *Actual notice* within ten[5] days is not required under Section 471.

(emphasis added).

Although in *Locy v. Pennsylvania Liquor Control Board*, 125 Pa.Commonwealth Ct. 481, 484, 557 A.2d 1164, 1165, *petition for allowance of appeal denied*, 522 Pa. 621, 563 A.2d 889 (1989), we noted that the record indicated that the license actually received notice, we unambiguously held that "[s]ending the notice by certified mail constitutes sufficient compliance with the statute."

We decline to legislate an actual notice requirement where the General Assembly failed to act. *See In Re Borough of Bear Creek Village*, 150 Pa.Commonwealth Ct.

---

4. The Bureau acknowledges that, in some instances, an appellate court may consider an issue not raised on appeal if it had been considered on its merits by the trial court and it is in the interest of justice or public policy to address the issue. *American Association of Meat Processors v. Casualty Reciprocal Exchange*, 527 Pa. 59, 588 A.2d 491 (1991). It notes, however, that application of that exception is not favored by the courts.

It further contends that this case does not come under the exception because *Cantina Gloria's* is procedural in nature and does not impact upon Can's substantive rights. *See Shadyside Hospital/Heritage v. Workmen's Compensation Appeal Board (Berry)*, 163 Pa.Commonwealth Ct. 152, 639 A.2d 1337 (1994) (holding that amendments to workers' compensation law altering the scope of review should not be applied retroactively because changes in scope of review have been held to be procedural in nature since they have no bearing upon a claimant's right to relief upon a given set of facts.) We agree.

5. The section was subsequently amended to provide the Bureau with thirty days.

595, 616 A.2d 111 (1992), *petition for allowance of appeal denied*, 533 Pa. 664, 625 A.2d 1196 (1993) (holding that courts are not free to engraft additional verbiage when a statute is clear and unambiguous.) Thus, we conclude that, even though the parties agree that Nott failed to receive the notice reasonably calculated to reach his attention, notice was sufficient here under Section 471(b) of the Code.

### 3. Knowledge of Drug-related Activities on Premises:

■ In *Pennsylvania Liquor Control Board v. TLK, Inc.*, 518 Pa. 500, 544 A.2d 931 (1988), our Supreme Court held that, whenever the underlying conduct violates the Crimes Code rather than the Liquor Code, there must be some element of scienter on the part of licensee to endanger the license. The Commonwealth must initially prove that the licensee knew or should have known about the illegal activities. Then, the burden shifts to the licensee to show that he took substantial affirmative steps to guard against a known pattern of illegal activities. *TLK, Inc.*

The Bureau argues that the drug activity on the premises was so pervasive and commonplace that there can be no doubt that Nott knew of the activity. It notes that Trooper Stackhouse testified that Nott often was present at the licensed establishment when she observed drug-related activities.

■ Nott argues in his brief that, as a corporate president with limited worldliness and small-town blissful ignorance, he should not be charged with the duty of knowing that an undercover, female drug officer was making clandestine drug deals on his premises. (Can's Brief at 28.) Contrary to Nott's argument, however, the standard here is "known or should have known" about the illegal activities. *TLK, Inc.*. After reviewing the testimony of Trooper Stackhouse regarding the pervasive and numerous drug-related activity on the premises and Nott's frequent presence (R.R. 83–4a), we must conclude that the finding that Nott should have known about the illegal activity is supported by substantial evidence. Some of this evidence has been aptly summarized by the trial judge, the Honorable J. Wesley Oler, Jr. as follows:

> Beginning on November 8, 1990, and continuing until August 27, 1991, Trooper Stackhouse was involved in approximately thirty drug transactions either in or on the licensed premises. At least seven of these transactions involved employees of Appellant while they were either working or off duty.

> In addition to being involved in drug transactions with the patrons and employees of Johnnie's Cafe, Trooper Stackhouse also observed several instances of unusual behavior which led her to believe that drug activity was occurring on the premises. This behavior included frequent entering and leaving of the bathrooms by the patrons and employees, an 'unusual amount of phone calls both with the pay phone and the phone underneath the bar,' frequent entering and exiting of the bar by certain individuals, and smoking of marijuana cigarettes or bowls along the side of or in the parking lot of the building. Furthermore, Trooper Stackhouse overheard conversations regarding drug activity 'typically every time on every date that [she] went' into the premises.

> Trooper Stackhouse also testified as to the extensive involvement in drug activities of several employees of Appellant. Such testimony included Trooper Stackhouse's observations that a certain employee of Appellant, 'would give [her] information concerning who was dealing inside the bar,' and that she would give Trooper Stackhouse information regarding drug activity in and around the premises. Additionally, Trooper Stackhouse testified as to the reputation of a cook at the licensed premises, stating that his 'main purpose other than a cook was the runner to get drugs.' In this regard, she explained that '[y]ou would give him the money, and he would go get [the drugs] and come back in and bring [the drugs] into the bar or make a deal that you could go outside the parking lot and make that deal.'

> Additionally, Trooper Stackhouse gave testimony as to the presence on the premises of Ronald P. Nott, the owner and

president of Can, Inc., on a frequent basis. Trooper Stackhouse stated that during the course of her one-year investigation of the licensed premises, she observed Ronald P. Nott '[a]t least 50 or more times' in the licensed premises. During this time, Ronald P. Nott 'was around the bar, in the dining room, [and] in the kitchen,' and '[h]e was there when [Trooper Stackhouse] was there.'

(Trial Court's July 7, 1993 Opinion at 2–4) (footnotes omitted).

### 4. Substantial Affirmative Steps:

Having found that there is substantial evidence to support the finding that Nott should have known about the drug-related activity on the licensed premises, we now turn to the issue of whether he took substantial affirmative steps to guard against the drug-related activities.

■■■ Once Nott had actual notice of the occurrence of the drug-related activities via the November 7, 1991 police raid of the licensed premises, he instituted regular bathroom patrols, removed people engaged in drug activities, posted an anti-drug policy, announced zero tolerance of drug activities on premises and terminated employees involved in drug activities. The Bureau argues that the steps taken were too late in that Nott instituted them only after the police raid, which was a year after the October 1990 commencement of the investigation. Nott contends that he had no obligation to take substantial affirmative steps until he had actual knowledge of the unlawful conduct. Thus, the issue here seems to be an interpretation of the time period in which these steps should have been taken.

In *TLK, Inc.,* our Supreme Court held as follows:

Due to the pervasive nature of this illicit activity, it may be said that the licensee should have known of the misconduct of his employee. That being the case, he is deemed to have permitted or acquiesced in the misconduct unless he proved that he took substantial affirmative measures to *prevent* it.

*TLK, Inc.,* 518 Pa. at 506, 544 A.2d at 934. Further, in that case, the Court noted that the investigating agent "denied seeing any signs prohibiting drug sales or use at any time during his six-month investigation" and that there is no evidence that "the licensee took the substantial affirmative steps necessary to *avoid* license revocation in the face of an obvious pattern of misconduct under the drug laws." *Id.* (emphasis added).

We interpret the Supreme Court's language in *TLK, Inc.,* especially its use of such prophylactic words as "prevent" and "avoid," to mean that a licensee is required to take affirmative steps once it becomes apparent that he *should have known* of the illegal activity, not when it can be said that he *actually knows* of the activity. For those reasons, we conclude that it was no error to find that Nott should have instituted substantial affirmative measures at the same time he should have been aware of the pervasive drug-related activity on his licensed premises.

### Conclusion

For the above reasons, we affirm the trial court's order upholding the Board's imposition of the 120–day liquor license suspension and $1,000.00 fine.

### *ORDER*

AND NOW, this 15th day of December, 1994, the order of the Court of Common Pleas of Cumberland County dated July 7, 1993 is hereby affirmed.

FRIEDMAN, Judge, dissenting.

I respectfully dissent because I cannot agree that, under the facts of this case, Licensee "knew or should have known" about the illegal activities.

The Liquor Code provides that a license may be suspended or revoked and fines imposed for a violation of the Liquor Code *or for other sufficient cause.* Section 471 of the Liquor Code, Act of April 12, 1951, P.L. 90, *as amended,* 47 P.S. § 4–471. Violations of criminal laws [1] other than the Liquor Code

---

1. Here, Licensee's liquor license was suspended

and a fine imposed because of drug activity relat-

can constitute other sufficient cause. *Pennsylvania Liquor Control Board v. TLK, Inc.,* 518 Pa. 500, 544 A.2d 931 (1988). The Pennsylvania Supreme Court, in *TLK, Inc.,* stated that it would not

> apply the rigid standard of strict liability [applicable to violations of the liquor laws and regulations] when the subject conduct does not violate the liquor laws, but instead involves conduct prohibited by the Crimes Code, the Controlled Substance, Drug, Device and Cosmetic Act, or other penal legislation. In the latter cases, some element of scienter on the part of the licensee is required to endanger the liquor license.

*Id.* at 504, 544 A.2d at 933. The Court identified two principles which "go hand in hand" to determine the "quantum of guilty knowledge or intent [which] will justify proceedings against a liquor license": (1) whether the licensee "knew or should have known of the illegal activities by an employee or patron"; and (2) whether the licensee took "substantial affirmative steps to guard against a known pattern of illegal activities." *Id.* at 504–05, 544 A.2d at 933. In *TLK, Inc.,* the Court applied these principles to the facts and determined that license revocation was proper. These same principles apply to this case; however, I believe that under the circumstances here, the license suspension was not warranted.

Here, there is no evidence that Licensee knew of the undercover agent's drug dealings

in the bar, nor of any other drug activities on the property. In fact, the Administrative Law Judges believed Mr. Nott's[2] testimony that he had no idea drug activity was occurring. (Adjudication at 13.) Thus, the license suspension and fine were imposed for Licensee's lack of action during the period when Licensee had no actual knowledge of the illegal activities on the assumption that Mr. Nott "should have known" of these activities, many of which were completed outside in the parking lot, or even in another city. In *TLK, Inc.,* the court concluded that the licensee should have known of the drug trafficking at the establishment because of the pervasive nature of the illegal activity. There, the undercover agent not only purchased drugs himself, but "observed drug sales between patrons, sales of stolen goods, the use of drugs in the bathroom, and a drug sale take place in the presence of the bartender." *Id.* at 506, 544 A.2d at 934. By contrast, in this case, all of the drug buys were initiated by and involved the undercover agent; there are no findings of other drug buys initiated or completed on the property.[3]

Here, the record and the findings simply do not support a conclusion that there was a discernible pattern of drug activity of which Licensee should have been aware. By analogy to tort law,[4] a licensee should be held to the same standard as a reasonably prudent and intelligent person in his situation. The standard is one of reasonableness.[5] The un-

---

ed to the property, apparently in violation of The Controlled Substance, Drug, Device and Cosmetic Act (Act), Act of April 14, 1972, P.L. 233, *as amended,* 35 P.S. §§ 780–101–780–144. There is no finding that Licensee or an authorized agent was *convicted* of violating this Act.

**2.** Can, Inc. is the licensee. Mr. Ronald P. Nott, "a stockholder, officer, director and manager of Licensee," was on the property during much of the investigation. (ALJs' Findings of Fact, No. 46.)

**3.** The only finding possibly indicating other drug activity, also involves the undercover agent's perceptions: She "noticed an excessive amount of activity of patrons using the restrooms and, within seconds, coming right back out. Such behavior is one activity that *suggests* unlawful drug transaction. Other activity that *may be indicative* of unlawful drug transactions also occurred at the licensed premises such as: frequent phone calls; leaving the premises and returning min-

utes later; [and] conversations concerning drugs." (ALJs' Findings of Fact, No. 47.) (Emphasis added.)

**4.** With regard to the "should have known" standard, the Black's Law Dictionary definition refers to the Restatement of Torts:

> *Should know.* The words "should know" are used throughout the Restatement of Torts to denote the fact that a person of reasonable prudence and intelligence or of the superior intelligence of the actor would ascertain the fact in question in the performance of his duty to another, or would govern his conduct upon the assumption that such fact exists. Restatement, Second, Torts, § 12.

Black's Law Dictionary 785 (5th ed. 1979).

**5.** *See Commonwealth v. $2,523.48 U.S. Currency,* —— Pa. ——, 649 A.2d 658 (1994) (a parallel situation, involving the innocent owner *defense*

dercover agent is trained to recognize signs of drug activity and to gather information for a conviction;[6] a licensee is not so trained. Without training, Licensee should not be expected to have recognized that this undercover agent was engaged in drug activity. In my opinion, this was not a discernible pattern of drug activity. Furthermore, the evidence shows that once Mr. Nott knew of the violations, he took extraordinary steps to stop it.

I would reverse and, accordingly, I dissent.

to a forfeiture action, in which the Supreme Court held: property owners are not required to perform heroic, vigilante or police actions in order to stop drug activity on their property; a property owner is not an adjunct of the law enforcement community; the standard is one of reasonableness).

6. Presumably, the undercover agent is also trained to make buys in a somewhat surreptitious manner so as not to arouse the suspicions of her sources.