IN THE COMMONWEALTH COURT OF PENNSYLVANIA

York Best Food, LLC                          :
t/a Li's Kitchen,                            :
                          Appellant          :
                                             :
               v.                            :
                                             :   No. 1076 C.D. 2017
Pennsylvania Liquor Control Board            :   Argued: September 14, 2018


BEFORE:    HONORABLE P. KEVIN BROBSON, Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE DAN PELLEGRINI, Senior Judge (P.)

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                              FILED: October 11, 2018


        York Best Food, LLC t/a Li's Kitchen (Licensee) appeals from the York

County Common Pleas Court's (trial court) July 11, 2017 order denying Licensee's

appeal from the Pennsylvania Liquor Control Board's (PLCB) refusal to renew

Licensee's Eating Place Retail Dispenser License No. E-12215 (License).  The sole

issue for this Court's review is whether the trial court's findings of fact were

supported by substantial record evidence.[1]  Upon review, we affirm.

        Licensee operates a small eatery with the privilege of selling malt or

brewed beverages at 287 West Market Street, York, Pennsylvania (Licensed

Premises).[2]  When Licensee filed an application with the PLCB to renew the License

_____

        [1] In its Statement of Questions Presented, Licensee also contends that the trial court
committed an error of law by concluding that Licensee was responsible for incidents for which no
citations were issued.  *See* Licensee Br. at 2.  Because this second issue is subsumed in the analysis
of the first, we have combined the issues herein.

        [2] Licensee sells food and beer for on-premises consumption or take-out.  According to
Licensee's sole officer, member and approved manager Zhen Ting Li (Li), Licensee's sales ratio is
approximately 60% food to 40% alcohol.  *See* Reproduced Record (R.R.) at 243a, 277a.  Li
represented that Licensee sells single cans of beer to go, and packages them in brown paper or
plastic shopping bags.  *See* R.R. at 313a.

for the renewal period beginning March 1, 2016 and ending February 28, 2018, the PLCB's Bureau of Licensing (Bureau) objected to the renewal pursuant to Section 470 of the Liquor Code.[3]  Specifically, the Bureau alleged that Licensee

> may no longer be eligible to hold a license based upon the improper conduct of [the Licensed Premises,] as there have been approximately sixteen (16) incidents of disturbances at or near [the Licensed Premises] during the time period March 2014 to present reported to the York City Police Department.  This activity includes, but is not limited to[,] visibly intoxicated persons, disorderly operations, drugs, stabbings, open containers, and assaults.

PLCB Notes of Testimony, April 19, 2016 (PLCB N.T.) Ex. B-3 at 1 (Reproduced Record (R.R.) at 330a).  The Bureau also asserted that, based upon those incidents, Licensee's sole officer, member and approved manager Zhen Ting Li (Li) "may no longer be reputable as required under Sections 102 and 470 of the Liquor Code (47 P.S. §§ 1-102 and 4-470)."  R.R. at 330a.

On April 19, 2016, a hearing was held before a Hearing Examiner who recommended that the PLCB deny Licensee's renewal application or, in the alternative, grant the renewal subject to an offer-in-compromise agreement.  *See* R.R. at 398a-468a.  The PLCB accepted the Hearing Examiner's recommendation and, on December 7, 2016, it refused Licensee's renewal application.  *See* PLCB Certified Record, December 7, 2016 Refusal Letter.  Licensee appealed to the trial court.[4]  The

---

[3] Act of April 12, 1951, P.L. 90, *as amended*, 47 P.S. § 4-470.  The Liquor Code amendments made pursuant to the Act of June 8, 2016, P.L. 273 (effective August 8, 2016) did not change the relevant provisions of the Liquor Code relied upon herein.

The Bureau's first objection letter was dated February 17, 2016.  *See* R.R. at 327a.  The Bureau issued an amended objection letter on March 28, 2016.  *See* R.R. at 330a.

[4] The PLCB issued its opinion on February 7, 2017.  *See* Licensee Br. App. 1 (PLCB OP.); *see also* R.R. at 469a-515a.  The PLCB filed a Pre-Trial Statement on March 1, 2017.  *See* R.R. at 516a-522a.  Licensee filed a memorandum of law in support of its appeal on April 12, 2017.  *See* R.R. at 523a-533a.

trial court conducted a *de novo* hearing on May 2, 2017, at which Li testified.[5]  *See* R.R. at 534a-568a.  Thereafter, the trial court found in the PLCB's favor and likewise denied Licensee's renewal application.[6]  *See* Licensee Br. App. 2 (Trial Ct. Op.); *see also* R.R. at 570a-587a.  Licensee appealed to this Court.[7]

Initially, "[i]n Section 104(a) of the Liquor Code, [47 P.S. § 1-104(a)], the General Assembly has authorized the [PLCB] to exercise broad police powers in fulfilling its duty to protect the public welfare, health, peace and morals of the citizens of the Commonwealth."  *Philly Int'l Bar, Inc. v. Pa. Liquor Control Bd.*, 973 A.2d 1, 3 (Pa. Cmwlth. 2008) (footnote omitted).  "To be sure that the interests of the citizens of the Commonwealth are protected, the [PLCB] must closely examine the operation of an establishment that holds a license to serve alcoholic beverages when assessing whether to renew its liquor license."  *Id.* at 4.  Accordingly, "[t]he Liquor Code and our cases are clear that the [P]LCB has discretion in determining whether to grant or renew a liquor license."  *St. Nicholas Greek Catholic Russian Aid Soc'y v. Pa. Liquor Control Bd.*, 41 A.3d 953, 959 (Pa. Cmwlth. 2012).

---

[5] A certified Mandarin interpreter was provided for the hearing.  *See* R.R. at 536a.

[6]  Pursuant to Section 464 of the Liquor Code, 47 P.S. § 4–464, when an appeal is taken from a [PLCB] decision, the trial court hears the matter *de novo*.  The trial court must make its own findings of fact and conclusions of law based upon the record of the proceedings below, if introduced by the [PLCB], together with any other evidence that is properly submitted during the *de novo* hearing.  The trial court may sustain, alter, modify or amend the [PLCB's] decision, even if it does not make findings of fact materially different from those made by the [PLCB].

*S & B Rest., Inc. v. Pa. Liquor Control Bd.*, 114 A.3d 1106, 1111 (Pa. Cmwlth. 2015) (citation omitted).

[7] "Our review in a liquor license renewal case is limited to a determination of whether the trial court's findings of fact are supported by substantial evidence, whether it abused its discretion, or whether it committed an error of law."  *St. Nicholas Greek Catholic Russian Aid Soc'y v. Pa. Liquor Control Bd.*, 41 A.3d 953, 954 n.1 (Pa. Cmwlth. 2012).

As a guiding principle, Section 470(a.1) of the Liquor Code provides, in relevant part:

> The Director of **the [Bureau]** may object to and the [PLCB] **may refuse a properly[-]filed license application**:
>
> (1) if the licensee, its shareholders, directors, officers, association members, servants, agents or employes have violated any of the laws of this Commonwealth or any of the regulations of the [PLCB]; [or]
>
> . . . .
>
> (4) **due to the manner in which this** . . . **licensed premises was operated** while the licensee . . . [was] involved with that license. When considering the manner in which this . . . licensed premises was being operated, **the [PLCB] may consider activity that occurred on or about the licensed premises or in areas under the licensee's control if** the **activity occurred when the premises was open** for operation **and if there was a relationship between the activity outside the premises and the manner in which the licensed premises was operated**. The [PLCB] may take into consideration whether any substantial steps were taken to address the activity occurring on or about the premises.

47 P.S. § 4-470(a.1) (emphasis added). Based thereon, this Court has ruled:

> The law is well-established that **a licensee** is strictly liable for Liquor Code violations, and **may also be held accountable for non-Liquor Code violations, like those under the Crimes Code,**[8] **if** it can be established that **there was a pattern of illegal activity on the licensed premises about which the licensee knew or should have known, and the licensee failed to take substantial steps to prevent such activity**.

*Paey Assocs., Inc. v. Pa. Liquor Control Bd.*, 78 A.3d 1187, 1198 (Pa. Cmwlth. 2013) (emphasis added); *see also Pa. Liquor Control Bd. v. TLK, Inc.*, 544 A.2d 931 (Pa. 1988). "Section 470(a.1)(4) of the Liquor Code makes clear that licensees are not

---

[8] 18 Pa.C.S. §§ 101-9183.

4

permitted to push their problems out the front door and disregard them. Rather, they must monitor what goes on outside and immediately adjacent to their premises as an extension of their operations." *Paey Assocs.*, 78 A.3d at 1200.

At the trial court hearing, the trial court accepted the record from the PLCB (PLCB Record), which included documentation and testimony regarding 14 incidents at or near the Licensed Premises between March 17, 2014 and October 15, 2015. *See* R.R. at 537a-538a. Because the trial court concluded that there was not sufficient evidence to link two of the events to the Licensed Premises,[9] only the remaining 12 are at issue on appeal. The trial court made the following findings about those 12 incidents:

> 1. On March 17, 2014, at approximately 7:58 p.m., officers responded to a call of an individual, William Sechrist [(Sechrist)], passed out on the floor inside of [the Licensed Premises]. Officers observed a strong odor of alcohol on his breath and person. [Sechrist] was later cited for public drunkenness. ([PLCB N.T. at] 63-68).
>
> 2. On May 2, 2014, at approximately 9:38 p.m., officers responded to a call that an individual, James Kelly [(Kelly)], was passed out on the sidewalk outside [the Licensed Premises] with a laceration on his head. It is alleged that [] Kelly was severely intoxicated when he fell. ([PLCB N.T. at] 68-75).
>
> 3. On June 8, 2014, at approximately 11:11 p.m., officers responded to a call of a disorderly individual, Randy Spellman [(Spellman)], who was refusing to leave [the Licensed Premises] after being told numerous times to leave. Mr. Spellman showed signs of intoxication and was removed from the premises. ([PLCB N.T. at] 75-83).
>
> 4. On July 2, 2014, at approximately 7:00 p.m., officers were informed by a confidential informant[10] that an

---

[9] The trial court concluded that the Bureau failed to meet its burden as to the May 27 and August 27, 2015 incidents. *See* Trial Ct. Op. at 11.

[10] Confidential and reliable informants are those persons deemed reliable by the District Attorney's Office after providing consistent, accurate information that has led to past drug arrests,

5

African-American female, 5'8", 200 lbs.[,] wearing a gray shirt with a logo on it and blue jeans was selling drugs inside [the Licensed Premises]. Officers entered the establishment and discovered a woman, Barbara Chance [(Chance)], who fit the description, inside the establishment. Officers discovered three packets of heroin on her person. ([PLCB N.T. at] 83-95).

5.     On July 23, 2014, at approximately 5:30 p.m., videotape evidence showed three patrons inside [the Licensed Premises] engaging in a verbal argument. The three patrons took their disagreement outside where they proceeded to punch and push each other. One of the men, Robert Coleman [(Coleman)], stabbed the victim, Walter Cole [(Cole)], in the side with a knife and the altercation ended. Officers responded to treat [] Cole and [] Coleman was later arrested for the stabbing. ([PLCB N.T. at] 134-142).

6.     On July 30, 2014, at approximately 6:27 p.m., officers were informed by a confidential informant that he would meet David Hairston [(Hairston)] in the parking lot of [the Licensed Premises] to buy crack cocaine. The informant purchased the cocaine from a second individual, Bryan Hillery [(Hillery)]. [] Hillery went inside [the Licensed Premises] and seemed to make contact with an unknown bouncer. [] Hillery later left the establishment through the other entrance/exit to possibly avoid arrest. Both dealers were later arrested. ([PLCB N.T. at] 12-43, 143-157).

7.     On October 11, 2014, at approximately 12:05 a.m., officers responded to a call that a man, Raymond Rhoades [(Rhoades)], was passed out in front of [the Licensed Premises]. Officers observed that [] Rhoades had a strong odor of alcohol coming from his person. ([PLCB N.T. at] 108-114).

8.     On January 29, 2015, at approximately 2:12 p.m., a confidential informant informed officers that a drug dealer named Daryl 'Supreme' Allston [(Allston)] was going to sell him heroin at [the Licensed Premises]. While Allston

and "anything that they see can almost be held at the same level of truthfulness . . . as [witnessing police officers.]" R.R. at 197a.

6

did not show up, a man named James Greer [(Greer)] entered the premises for about 5-10 minutes, came outside to the front stoop, and sold the informant the heroin. [] Greer was later arrested. ([PLCB N.T. at] 44-54, 168-177).

9. On January 30, 2015, at approximately 11:00 a.m., [Allston] was inside [the Licensed Premises] and offered to sell confidential informant heroin. Officers observed [] Allston sitting at the bar and later found heroin inside of his jacket pocket. [] Allston was placed under arrest. ([PLCB N.T. at] 177-195).

10. On February 20, 2015, at approximately 11:34 p.m., a confidential informant informed officers that someone was selling heroin inside of [the Licensed Premises]. Officers directed a controlled buy-bust operation and determined that the security guard at [the Licensed Premises], Louis Rodrigues [(Rodrigues)], was the individual selling heroin. Officers arrested [] Rodrigues and discovered 50 bags of heroin, 22 bags of cocaine, suboxone, and $1100 in cash on his person. Rodrigues was later fired from his job. ([PLCB N.T. at] 153-167).

11. On February 26, 2015, at approximately 1:20 p.m., officers observed a male, Angel Rivera Rosado [(Rosado)], sitting outside [the Licensed Premises] between the front door and the parking lot drinking an open container of alcohol. Officers cited [Rosado]. ([PLCB N.T. at] 123-132).

. . . .

14. On October 15, 2015, it was reported that an individual exited [the Licensed Premises], walked to a window, and raised his middle finger towards his ex-girlfriend who was inside the establishment. ([PLCB N.T. at] 212).

Trial Ct. Op. at 2-6.

Licensee argues that the trial court's findings of fact (FOF) were not supported by substantial record evidence. A review of the PLCB Record admitted into evidence, reveals that with respect to FOF 1, York City Police Officer (Officer) John Huncher (Officer Huncher) testified that he was dispatched to the Licensed

Premises on March 17, 2014 at approximately 7:58 p.m. to investigate an ambulance call and, when he arrived, he observed Sechrist "passed out in the middle of the establishment," mumbling under his breath and smelling of an intoxicating beverage. R.R. at 71a; *see also* R.R. at 72a-74a. Officer Huncher recalled that Sechrist was transported to the hospital and he was cited for public drunkenness. *See* R.R. at 72a. Officer Huncher acknowledged that he did not know whether Sechrist entered the premises in that condition, was refused service and/or asked to leave and just passed out on the floor. *See* R.R. at 73a-74a.

Regarding FOF 2, Officer Dustin Gehron (Officer Gehron) reported that he was dispatched to the Licensed Premises on May 2, 2014 at approximately 9:38 p.m. and observed Kelly passed out on the Newberry Street sidewalk to the left of the Licensed Premises. *See* R.R. at 76a-82a. Officer Gehron reported that Kelly was intoxicated, as evidenced by an odor of alcohol, a staggered gait, bloodshot eyes and slurred speech. *See* R.R. at 79a. Officer Gehron learned that Kelly lived at the YMCA located at 90 North Newberry Street and was heading home when he fell. *See* R.R. at 77a. Officer Gehron asserted that Kelly was transported to the hospital and was cited for public drunkenness. *See* R.R. at 77a. Officer Gehron described that the area where this incident occurred is a busy public thoroughfare, and Licensee's place is "where usually everyone goes to drink." R.R. at 80a.

Relative to FOF 3, Officer Michael Meeker (Officer Meeker) testified that he was on patrol on June 8, 2014 at approximately 11:11 p.m., when he was dispatched to the Licensed Premises due to a disorderly subject. *See* R.R. at 83a. He learned that Rodrigues directed patron Spellman to leave the establishment, but he refused and fell over. *See* R.R. at 83a-85a. Officer Meeker discovered Spellman outside either on the sidewalk or in Licensee's parking lot, and described that he "was highly intoxicated" and drooling, and a had a strong odor of alcohol on his person, slurred speech and difficulty standing. R.R. at 84a-85a; *see also* R.R. at 86a, 89a.

8

Officer Meeker explained that although he did not recall whether Spellman had consumed alcohol while he was in the Licensed Premises, the next closest bars were the Waterway Bar approximately 1½ blocks away, and the Lincoln Bar approximately five blocks away. *See* R.R. at 87a.

With respect to FOF 4, Officer Christopher Husted (Officer Husted) reported that, on July 2, 2014 at approximately 7:00 p.m., based on a tip that Chance was selling drugs outside Licensee's establishment, he found Chance inside and asked her to go outside to talk because the music was too loud. *See* R.R. at 91a-92a, 99a. Once outside, Chance denied that she was selling drugs, but agreed to a search that revealed she had three packets of heroin in her pocket, for which she was arrested and charged with misdemeanor drug possession. *See* R.R. at 92a-95a. Officer Husted learned that Chance purchased the heroin from a black male inside the Licensed Premises, but the man was no longer there when Officer Husted checked. *See* R.R. at 94a-95a. Officer Husted recalled that there were people inside when he first entered, who had left while he was with Chance outside. *See* R.R. at 98a, 100a-101a. Despite that Officer Husted was in the Licensed Premises twice, and Chance was arrested outside the front door, Licensee's employees did not inquire as to why officers were there. *See* R.R. at 95a-97a.

Regarding FOF 5, Officer Matthew Irvin (Officer Irvin) testified that, on July 23, 2014 at approximately 5:30 p.m., he was dispatched to the Licensed Premises due to a stabbing. *See* R.R. at 103a. When he arrived, he saw Cole on the ground immediately outside Licensee's door being treated by firefighters (whose station is nearby) for a stab wound in his abdomen. *See* R.R. at 103a, 108a-109a; *see also* PLCB N.T. Ex. B-5 (R.R. at 333a). Officer Irvin recalled viewing Licensee's surveillance video which depicted an argument among Cole and two patrons, including Coleman at the cash register inside; they took their dispute outside where Cole was stabbed. *See* R.R. at 103a-110a, 113a. Although the assault occurred just

9

outside the video camera's range, Officer Irvin learned from Cole that Coleman stabbed Cole several times. *See* R.R. at 103a-109a. Officer Irvin stated that Licensee's employees did not intervene in the situation. *See* R.R. at 107a-108a, 113a. Officer Irvin expressed that Licensee's employees are always cooperative. *See* R.R. at 112a.

Officer Kyle Pitts (Officer Pitts) reported that he assisted Officer Irvin with the stabbing incident on July 23, 2014, and charged Coleman with felony aggravated assault as a result thereof. *See* R.R. at 140a-143a. He reflected that although some of the incident occurred off-camera, it appeared that Licensee's employees were not present. *See* R.R. at 147a. Officer Pitts' account was nearly identical to Officer Irvin's description, except he added that he and Officer Irvin saw Coleman walking in the direction of the Licensed Premises approximately 30 minutes before the stabbing occurred. *See* R.R. at 149a-153a.

Relative to FOF 6, Officer Daniel Kling (Officer Kling) related that, on July 30, 2014, he was watching Licensee's parking lot from across the street from 6:27 p.m. until 8:10 p.m., when he saw Hillery openly hand a confidential informant crack cocaine in broad daylight. *See* R.R. at 23a, 44a-46a. Officer Kling recalled that there were always approximately five people loitering in the parking lot at all times during that period, but Licensee's employees did not check the area or move them along. *See* R.R. at 40a, 47a-48a. Officer Kling recalled that, after the drug transaction took place, officers notified Licensee's counter person of what occurred and requested the parking lot video surveillance footage, which the employee cooperatively provided.[11] *See* R.R. at 41a-42a, 46a.

Officer Pitts added relative to the July 30, 2014 drug transaction that the location was chosen because the confidential informant had purchased drugs in that

---

[11] Officer Kling stated that Licensee has "always been very cooperative with video footage." R.R. at 41a-42a.

location in the past. *See* R.R. at 153a-154a, 157a. He confirmed that Licensee's employee was cooperative in showing the officers the video surveillance footage that day. *See* R.R. at 159a. Officer Pitts declared "that most of [his] drug investigations in that area are targeted on [the Licensed Premises]," R.R. at 160a, "[i]n the parking lot or inside the building." R.R. at 162a. He estimated that he has made at least six to ten drug arrests at Licensee's establishment over the past three to four years. *See* R.R. at 161a, 163a.

With respect to FOF 7, Officer Irvin recounted that he was patrolling Licensee's neighborhood on October 11, 2014 at 12:05 a.m., when he witnessed Rhoades passed out in front of the Licensed Premises (near the brown door to the right of Licensee's entrance).[12] *See* R.R. at 115a-116a; *see also* PLCB N.T. Ex. B-5 (R.R. at 333a). Officer Irvin recalled that Rhoades was unresponsive, had a strong odor of alcohol about him, and snot was coming from his nose. *See* R.R. at 116a-117a. Rhoades was taken by ambulance to the hospital and was cited for public drunkenness. *See* R.R. at 116a-117a. Officer Irvin declared that the Licensed Premises was open at the time, and the ambulance pulled up out front, but none of Licensee's employees came outside to find out what had occurred. *See* R.R. at 117a. Officer Irvin described the area of Licensee's establishment as busy, but only Licensee is open at that hour of night, and it is popular since "[t]here's not a lot of places that are open that make food to order until 2:00 a.m." R.R. at 112a; *see also* R.R. at 118a-120a. Officer Irvin revealed that he was familiar with Rhoades from prior incidents of public drunkenness. *See* R.R. at 117a. Officer Irvin acknowledged that he did not know whether Rhoades was served by Licensee that night, but he had seen Rhoades patronize Licensee's bar before and since this incident. *See* R.R. at 118a-120a. He added that the next closest licensed establishment was the Lincoln

---

[12] The brown door leads into the building where the Licensed Premises is located, but Officer Irvin was not sure where the door leads once inside the establishment. *See* R.R. at 116a.

Bar approximately four blocks away, and Rhoades lived approximately ten blocks away from the Licensed Premises. *See* R.R. at 118a.

Regarding FOF 8, York City Police Detective Scott Nadzom (Detective Nadzom) testified that, although there are other bars in the area and drugs are rampant in York City, the Licensed Premises "was the primary place" for drugs on Newberry and Market Streets. R.R. at 59a. He recollected that he conducted a surveillance on January 29, 2015 for approximately 40 minutes, during which he observed three or four people outside when Greer exited the Licensed Premises, conduct a drug transaction with a confidential informant outside Licensee's door at 2:12 p.m. and then re-enter the establishment. *See* R.R. at 51a-61a; *see also* PLCB N.T. Ex. B-5 (R.R. at 333a).

Detective Nadzom reported that the investigation was initiated because there were "lots of complaints about the establishment . . . about drug dealing." R.R. at 58a. Detective Nadzom also recounted that Greer was not the original target of the investigation that day, but rather it was Allston. *See* R.R. at 58a; *see* R.R. at 176a. Detective Nadzom did not witness any of Licensee's employees check outside or attempt to disperse the people during the time he conducted the surveillance. *See* R.R. at 60a. He also opined that since he could see inside the Licensed Premises when the drug transaction took place, people inside "could see if they were looking out the window." R.R. at 56a-57a.

York City Police Officer Zachary Pelton (Officer Pelton) recalled relative to the January 29, 2015 drug sale that the confidential informant informed him about Allston selling drugs at Licensee's establishment. *See* R.R. at 176a. Officer Pelton was familiar with Allston's drug connection for a few years. *See* R.R. at 176a, 183a. The confidential informant called the telephone number Allston offered for the drug purchase, which Greer answered and directed the confidential informant to the Licensed Premises where Greer met the confidential informant and

12

the transaction took place. *See* R.R. at 177a-178a, 181a. Officer Pelton agreed that none of the officers discussed the incident with Licensee or asked to see Licensee's video surveillance footage. *See* R.R. at 182a. Officer Pelton charged Greer with felony delivery of a controlled substance (heroin). *See* R.R. at 179a.

Relative to FOF 9, Officer Pelton also testified that, on January 30, 2015, sometime before 11:00 a.m., the same informant from January 29, 2015 told Officer Pelton that Allston was again inside the Licensed Premises with heroin he was willing to sell to the informant. *See* R.R. at 185a, 195a, 197a-198a. The informant described where Allston was sitting and what he was wearing. *See* R.R. at 185a. Officer Pelton stated that he and other officers went into the Licensed Premises at 11:00 a.m. wearing vests and badges and found Allston in the location and wearing what the informant had described. *See* R.R. at 186a, 198a-200a. Officer Pelton recalled talking to Allston, taking him into custody, removing Allston's property - a jacket and $318 in cash - from the counter and escorting him outside. *See* R.R. at 186a-188a, 190a, 199a-201a. Officer Pelton reported that a glassine packet of heroin was found in Allston's watch pocket when he was searched. *See* R.R. at 187a. Officer Pelton described:

> At first, [Allston] informed me that he snorts it and he uses one or two bags a day. I then later had a conversation with him once we got down to central booking. I advised him that we were going to conduct a second search, and if he had anything else on him to let me know. [Allston] and I have a history, so I figured I can reason with him. He can be pretty honest. But [Allston] did advise me he had further amount of heroin on him, provided me with a bundle [of ten glassine baggies of heroin], which he had tucked into his pants. And he was actually going to try to hide in my car, a bundle of heroin, just to be clear there.
>
> . . . .
>
> That was in his pants. He had it tucked back in behind his butt crack.

. . . .

> He said about $100 worth of [the $318] was from selling drugs.

R.R. at 188a-189a. Officer Pelton clarified that Allston did not have the drugs out in the open inside Licensee's premises,[13] and he was not informed that Allston conducted any drug sales therein. *See* R.R. at 191a-192a. Officer Pelton filed felony drug possession charges against Allston for this incident. *See* R.R. at 189a-190a.

With respect to FOF 10, Officer Pitts stated that, on February 20, 2015, at approximately 11:00 p.m., he received a report from a reliable informant that heroin was being offered for sale by an individual inside the Licensed Premises. *See* R.R. at 164a. Officer Pitts arranged for the informant to conduct a drug purchase that took place at approximately 11:30 p.m. as follows:

> The informant went inside, came back out and met back up with me . . . --- . . . turned over two bags of heroin that . . . [the informant] . . . purchased from inside [the Licensed Premises.]
>
> . . . .
>
> The informant advised that a heavyset Hispanic male, who was later identified as [Rodrigues], . . . the security guard of [the Licensed Premises], had provided that heroin and was in possession of additional narcotics.
>
> Based on that information, we responded to [the Licensed Premises], located [] Rodrigues inside seated at the counter, took him into custody based on the reliable information, found him to be in possession of --- I think it was 50 bags of heroin, 22 [Ziploc] bags of powdered cocaine and $1,200 in cash --- or $1,100 in cash.

R.R. at 165a; *see also* R.R. at 164a, 166a-168a. Officer Pitts added that Rodrigues also possessed the $20.00 of official funds he gave the confidential informant to use

---

[13] Officer Pelton agreed that drug dealers do not keep their contraband in the open, for fear of being caught. *See* R.R. at 193a-194a.

for the transaction,[14] and a pack of Suboxone, which he described as a controlled substance "used by people addicted to opiates as part of their recovery." R.R. at 166a. He recalled Rodrigues admitting to him that "[he] got the stuff . . . to make an extra buck[.]" R.R. at 169a. Rodrigues was arrested onsite and charged with felony drug possession with the intent to deliver.[15] *See* R.R. at 169a, 171a. Officer Pitts acknowledged that he did not know if Licensee or its employees were aware of Rodrigues' drug sales. *See* R.R. at 170a-172a.

Regarding FOF 11, Officer Dean Woodring (Officer Woodring) testified that on February 26, 2015, at approximately 1:20 p.m., he went to the Licensed Premises based upon a report from an off-duty officer that a male wearing a camouflage jacket was drinking outside. *See* R.R. at 130a, 134a. Upon his arrival, Officer Woodring observed Rosado, who matched the off-duty officer's description, intoxicated and consuming alcohol from a can in a brown paper bag in the parking lot near Licensee's side door and he cited Rosado. *See* R.R. at 132a, 135a; *see also* PLCB N.T. Ex B-6 (R.R. at 334a). He admitted that Rosado did not state where he purchased the alcohol, and Officer Woodring did not speak to Licensee's employees about the incident, nor was he aware of any of Licensee's employees being outside at any point while he was there. *See* R.R. at 133a, 135a-136a. He agreed that the interaction would have been visible to anyone watching Licensee's video feed, and stated that Licensee sells single beers to go. *See* R.R. at 137a, 139a. Officer Woodring acknowledged that the Waterway Bar is up the street and to the east one street over. *See* R.R. at 135a.

Finally, relative to FOF 14, Officer Stephen Aderhold (Officer Aderhold), who is the York City Police Department's records custodian and works as

---

[14] The $20.00 bill was photocopied prior to the transaction. *See* R.R. at 166a-167a, 173a.

[15] Because the confidential informant was not at all times within Officer Pitts' sight while inside the establishment, Rodrigues was not charged with delivery. *See* R.R. at 173a.

part of the detective bureau's Nuisance Abatement division, described how police reports are prepared, checked and maintained as business records. *See* R.R. at 203a-219a, 225a. The PLCB Hearing Examiner admitted into evidence over Licensee's objection, a police report for an incident that occurred on October 15, 2015 at approximately 5:35 p.m. at the Licensed Premises, wherein an officer cited Samuel Trice for disorderly conduct after he exited the establishment and made an obscene gesture through the window to his ex-girlfriend inside. *See* R.R. at 206a-209a, 219a, 235a-236a; *see also* PLCB N.T. Ex. 7 (R.R. at 335a-336a).

Officer Aderhold recounted that he contacted the PLCB in May 2015 about Licensee's operation due to "a rash of complaints and problems with that establishment, [that] actually came from citizens, businesses that surround the establishment, and I believe, also through the mayor's office and that chief's office . . . ." R.R. at 205a; *see also* R.R. at 202a, 209a, 211a, 219a, 237a-239a. He stated that relative to police resources and criminal/nuisance activity, particularly in 2014 and 2015, "[the Licensed Premises is] one of the top concerns as far as bars in the City of York," R.R. at 220a, due to public drinking, drug transactions and littering, noise and other problems. *See* R.R. at 225a, 227a. Officer Aderhold explained that he pulled all of the police records for incidents reported at 287 West Market Street. *See* R.R. at 205a-206a. He articulated that if an incident had nothing to do with the Licensed Premises, the police reports would designate the intersecting streets rather than Licensee's specific address. *See* R.R. at 225a-226a.

Officer Aderhold asserted that he is not aware of Licensee doing anything to prevent illegal and/or nuisance activity. *See* R.R. at 223a. Rather, when asked whether things have improved at the Licensed Premises, Officer Aderhold related that, between October 2015 and the April 2016 PLCB hearing, there have been nine additional police incidents, two of which Licensee reported. *See* R.R. at 220a-223a, 234a-235a. Officer Aderhold acknowledged that he was not specifically

16

aware of anyone contacting Licensee regarding the issues with the Licensed Premises, but offered that they could have. *See* R.R. at 227a-228a, 238a. He also testified that he was not aware of Licensee reaching out to the York City Police Department about the incidents occurring in and around the establishment. *See* R.R. at 228a-229a.

Li testified at the PLCB hearing, *see* R.R. at 240a-317a, and also before the trial court. *See* R.R. at 538a-558a. At the trial court hearing, Li explained that he has operated the Licensed Premises since 2011, it is open seven days per week from 7:00 a.m. to 2:00 a.m.,[16] and he is at the Licensed Premises "almost . . . all the time, except when [he] ha[s] to go out to get merchandise." R.R. at 542a; *see also* R.R. at 241a-243a, 548a-549a. He stated that Licensee employs nine people, including himself and one security person. *See* R.R. at 276a, 541a. He added that Licensee's driving patrons use an eight-space parking lot abutting the Licensed Premises. *See* PLCB Record Exs. B-4 – B-6 (R.R. at 332a, 334a).

Li described that one of buildings in the Licensed Premises' immediate vicinity is a YMCA; another is a place where "a lot of people go . . . to eat lunch, it seems like . . . the lunch [is] free"; a different building houses a place where "people, when they go in, they have to report the time that they go in. . . . [T]here is a certain time that [they] have to return back to that building"; and, in other buildings, old tools and clothes are sold. R.R. at 544a; *see also* PLCB Record Exs. B-4 – B-6 (R.R. at 255a, 332a, 334a).

Li acknowledged that there is a problem with drugs in the neighborhood. *See* R.R. at 545a. He articulated that he reports drug or other criminal activity to the police when he is aware of it, and he met with the police in 2014[17] and again in 2015,

---

[16] The Licensed Premises is open Sundays from 9:00 a.m. to 2:00 a.m. *See* R.R. at 242a.

[17] Although Li could not recall exactly when the 2014 meeting occurred, he testified that it took place after the July 23, 2014 stabbing incident occurred. *See* R.R.at 280a.

17

at the police department's request, and discussed concerns. *See* R.R. at 255a-256a, 278a-281a, 299a, 545a, 550a. In addition, Li recalled the police on two occasions telling him about incidents at the Licensed Premises after they occurred and, in 2014, informing him of neighbor complaints about Licensee's customers "doing things that . . . affect[ed] [the neighbors'] daily living." R.R. at 547a; *see also* R.R. at 248a-249a, 256a. Li claimed he took steps to correct the problems. R.R. at 551a.

Specifically, Li stated that Licensee hired two part-time security personnel in 2014, including Rodrigues, whose duties were not dedicated solely to security; rather, they "also [did] odd jobs in the restaurant." R.R. at 256a; *see also* R.R. at 257a, 277a, 281a-282a, 300a, 304a-305a, 307a-308a, 311a, 315a-316a. He recounted that the men worked either 4:00 p.m. or 5:00 p.m. to 8:00 p.m. or 9:00 p.m., or 8:00 p.m. or 9:00 p.m. to 2:00 a.m., and added that his counter personnel "can also do some sort of security." R.R. at 282a. Li recalled that those individuals wore jackets labeled "Li's Kitchen Security" and, in addition to watching people enter and exit the establishment, they were required to clean areas in the restaurant and in the parking lot as necessary. *See* R.R. at 257a-259a, 282a. He asserted that if a patron makes trouble inside the Licensed Premises, he/she is asked to leave and, if he/she does not leave, Li will call the police. *See* R.R. at 296a. When asked whether security personnel patrolled the parking lot, Li responded: "Well, he doesn't sit out there all the time. Sometimes he goes out there and then sometimes he comes in." R.R. at 257a. Li clarified at the trial court hearing that Licensee's security was required to monitor the inside and outside of the Licensed Premises in January 2015. *See* R.R. at 306a, 552a-553a. In order to prevent loitering, Li asserted that he will stand outside the Licensed Premises if there are people out there and will tell them to leave. *See* R.R. at 300a-301a.

Li described additional changes he made after the 2015 meeting with police, including removing three televisions and the jukebox from the Licensed

18

Premises,[18] raising alcohol prices and limiting total beer purchases to four per patron. *See* R.R. at 551a-552a; *see also* R.R. at 273a-275a, 291a-292a, 300a, 304a, 307a, 309a, 311a. He admitted that he does not check identifications of patrons he knows, or who look "pretty old aged." R.R. at 287a; *see also* R.R. at 292a. Li testified that the outside of the Licensed Premises has been well lit since 2011, with a street light and an additional, installed lighting at the exit. *See* R.R. at 272a-273a, 291a; PLCB Record Ex. L-8 (R.R. at 393a-397a). He also stated that Licensee checks patron identifications with a scanner.[19] *See* R.R. at 286a.

Li explained that Licensee has had security cameras on the Licensed Premises in the same place since it opened in 2011, but they were upgraded in 2015. *See* R.R. at 283a-284a, 296a-297a, 307a. He described that there are two security cameras in Licensee's parking lot, two outside the Licensed Premises (one in front and one in back), plus five or six cameras inside the Licensed Premises, all of which can be viewed on his computer at home, on a monitor inside the Licensed Premises visible to patrons, and on Li's cell phone. *See* R.R. at 542a-543a; *see also* R.R. at 261a-266a, 286a, 301a; PLCB Record Exs. L-4, L-5 (R.R. at 363a-382a). He described that one of the cameras shows the parking lot and Newberry Street to the left of the Licensed Premises. *See* R.R. at 299a, 301a. Li admitted at the PLCB hearing:

> Q. And is there somebody always viewing the computers?
>
> A. No.
>
> Q. How often would you say that the computers are being watched?

---

[18] Li represented that he removed the entertainment late in 2015 or early in 2016. *See* R.R. at 275a.

[19] Li described Licensee's two scanning devices – one built into the cash register, and a stand-alone device. *See* R.R. at 286a.

A. Usually only when something happens that I will go see. Normally there's --- nothing happened, everything's good, we don't watch it.

Q. So why did you put the security cameras up in the restaurant and outside?

A. I'm having to prevent criminals doing bad things in my place.

R.R. at 266a-267a; *see also* R.R. at 306a-307a. Li admitted that if he goes to the front window, he can see outside the front of the establishment. *See* R.R. at 301a.

Li asserted at the PLCB hearing that if he knows that a patron has committed a crime at or near the Licensed Premises, he makes the patron leave and, "if [the offense is] serious enough," he refuses to serve him/her. R.R. at 267a; *see also* R.R. at 314a. He further explained: "I usually have a photograph of the criminals. And then for those ones that I have photographs of, I leave the photos at my counter and then I would not allow these people to enter my place." R.R. at 267a; *see also* R.R. at 268a; PLCB Record Ex. L-6 (R.R. at 383a-390a). Li could not name the people in the photographs, but claimed he and the staff would recognize them if he saw them. *See* R.R. at 268a, 287a-290a, 298a.

In addition, Li represented that he and his son prepared, based upon information his son obtained from the police department in 2015, a list of "people who had committed crimes," and are not to be served at the Licensed Premises and on whom the police will be called if they refuse to leave.[20] R.R. at 268a; *see also* R.R. at 270a-272a, 290a-291a, 309a-310a, 314a; PLCB Record Ex. L-7 (R.R. at 391a-392a). He pronounced that he instructed the staff to refer to the photographs and the barred persons list before serving patrons. *See* R.R. at 272a, 301a-302a. Li did not recognize Rhoades' name on the list, nor could he explain why Rhoades was

---

[20] According to the list, Sechrist, Kelly, Spellman, Chance, Coleman, Hairston, Rhoades, Allston and Rosado have been permanently banned. *See* R.R. at 391a-392a.

20

permanently banned in 2014 and again in 2015. *See* R.R. at 293a-294a, 391a. Li did not know whether the list has been updated since 2015. *See* R.R. at 310a.

Li offered at the PLCB hearing that Licensee has had various informational signs posted on the Licensed Premises since it opened in 2011, but it has continued to post more in an effort "to prevent the . . . illegal activities happening at [his] place." R.R. at 261a; *see also* R.R. at 282a, 291a, 295a-296a. Li recalled:

> I have many signs. On the outside on the wall, I have a poster sign saying that this place is under 24 hours of video supervision. And then inside of the door, I have a poster saying that you are not allowed to have guns inside. [I] also ha[ve] a sign stating if you are not my customer, you are not allowed to stand in front of my door.

R.R. at 259a; *see also* R.R. at 261a; PLCB Record Ex. L-3 (R.R. at 337a-362a). At the trial court hearing, he added:

> The outside signs that no drinking liquor outside and no bringing food inside the restaurant. And the inside signs that if you do not purchase merchandise from our restaurant, you cannot sit here and no illegal activities in here, okay. And you are not allowed to purchase any alcoholic drink, if you are not 21 years old. And no fighting inside the restaurant.

R.R. at 543a. Li asserted that Licensee's staff is tasked with enforcing the no loitering policy. *See* R.R. at 283a.

Li claimed that he was unaware of the July 30, 2014, January 29, 2015 and February 20, 2015 drug transactions at the Licensed Premises until the PLCB hearings. *See* R.R. at 311a-313a, 550a, 554a, 556a. Although he recalled Greer's arrest inside on January 29, 2015, he claims he was never informed why Greer was arrested. *See* R.R. at 556a. Li reported that although he was aware that Rodrigues was arrested at the Licensed Premises on February 20, 2015, he was not aware that Rodrigues was selling drugs inside until he heard about it at the PLCB hearing. *See*

R.R. at 546a. He clarified that Rodrigues has not worked at the Licensed Premises since that day, and that a professional security company now provides security at the Licensed Premises. *See* R.R. at 310a, 546a. Li testified that Licensee also requires employee drug testing, and employees who test positive are fired. *See* R.R. at 547a.

Li represented at the PLCB hearing that following the rules is very important to him. *See* R.R. at 275a, 304a. He stated that he lives approximately 10 or 15 minutes from the Licensed Premises and, when he is not there, Licensee's entire staff is responsible for operations, rather than a single person. *See* R.R. at 276a, 310a. Li testified that no police officer or PLCB representative has ever approached him and suggested that Licensee's security employees used metal detection wands on patrons, nor have they ever asked him to submit activity logs. *See* R.R. at 555a. He claimed that the changes Licensee has made have decreased business. *See* R.R. at 304a.

"[T]he trial court has the same level of discretion as the [PLCB] in liquor license renewal cases[.]" *BCLT, Inc. v. Pa. Liquor Control Bd.*, 120 A.3d 1069, 1076 (Pa. Cmwlth. 2015). Here, based on the PLCB Record and Li's additional trial court testimony, the trial court concluded:

> 2) The [PLCB] met its burden of proof that Licensee knew about or should have known about nine out of the fourteen incidents that took place in 2014 and 2015. Licensee's actions contributed or furthered the sale of drugs or presence of intoxicated individuals inside the premises and in the area around the premises. Licensee is responsible, without scienter, for the four incidents where intoxicated individuals were found causing problems on [the Licensed Premises]. Licensee knew or should have known that drugs were being sold inside the [Licensed Premises] and in the parking lot.

> 3) [Relative] to the '[Rodrigues] Incident[,]' we conclude that this incident can be directly linked to [Licensee]. The [PLCB] provided by a preponderance of the evidence that [Rodrigues], a security guard and employee of [Licensee],

did sell narcotics on the premises. The record is silent as to whether [Licensee] conducted background checks or received personal references before hiring [] Rodrigues. Licensee knew or should have known that [] Rodrigues was engaged in illegal activities on the premises and did not take any remedial measures until after [] Rodrigues sold drugs on the [Licensed Premises] and was arrested.

4) We conclude that [based on] the manner in which [the Licensed Premises] was operated while [Licensee and its] servants, agents, or employees were involved with that [L]icense, activity occurred on or about the [L]icensed [P]remises or in areas under [Licensee's] control when the [Licensed Premises] was open for operation and that there was a relationship between the activity outside the premises and the manner in which the [Licensed Premises] was operated, such that the [PLCB's] decision to not renew the [L]icense is well supported.

5) Finally, we conclude that Licensee did not take enough affirmative measures or substantial steps to prevent future incidents from happening on its [Licensed Premises]. In particular, Licensee's hiring of the security guards was not effective because no background checks or personal references were obtained. The [trial c]ourt finds the measures taken by Licensee are not enough to allow the renewal of [its License].

Trial Ct. Op. at 17-18.

All of the incidents the Bureau presented were reported to have occurred at Licensee's record address during its operating hours, either inside the establishment, outside in its immediate proximity or in Licensee's parking lot. Moreover, in all of the instances, the police officers testified to some connection between the incidents and the Licensed Premises.

Specifically, on March 17 and June 8, 2014, patrons were drunk inside the Licensed Premises – one to the point of being unresponsive, and the other unable to walk under his own power.[21] On May 2 and October 11, 2014, men were

---

[21] Licensee's counsel (Counsel) argued before this Court that Licensee should not be punished for proactively reporting issues occurring at its premises in an effort to reduce them.

discovered outside Licensee's restaurant inebriated to the point that one fell and struck his head when he tried to walk, and the other was found unresponsive by officers who feared he was dead. All four of these individuals were cited for public drunkenness. In addition, on February 26, 2015, an intoxicated man was cited for drinking beer from a can in a brown paper bag outside Licensee's parking lot entrance. On October 15, 2015, an intoxicated man exited the Licensed Premises and was cited for disorderly conduct for his behavior immediately outside Licensee's window. On July 23, 2014, a disagreement that began inside the premises among three patrons continued outside and resulted in one of them being stabbed outside Licensee's front door. Licensee offered no evidence that the adjacent sidewalk or the parking lot were outside its control. Despite police (and, in some cases, ambulance) activity outside Licensee's establishment during these latter five incidents, and police request for Licensee's video of the stabbing, neither Li nor Licensee's other employees were seen outside or asked what was happening.

There were also five drug arrests in a six-month period that the Bureau tied to Licensee's operations. Acting on July 2, 2014 and January 29 and January 30, 2015 reports that patrons were offering drugs for sale inside Licensee's establishment, and a February 20, 2015 report that Licensee's employee (Rodrigues) was also doing so, police made drug arrests.[22] Although the July 30, 2014 drug sale occurred in Licensee's parking lot, the seller entered the Licensed Premises and met with Rodrigues immediately thereafter. And, despite that the January 29, 2015 drug

Under conditions in which it is clear that Licensee did not create the underlying situation, this Court may agree. However, there is no record evidence to support Counsel's representations that the March 17 and June 8, 2014 incidents were self-reported, and Counsel's claims do not suffice as such. *See Brady v. Workers' Comp. Appeal Bd. (Morgan Drive Away, Inc.)*, 923 A.2d 529 (Pa. Cmwlth. 2007) (counsel's statements are not evidence).

[22] In each of these instances, the officers learned that drugs were offered to the informants inside Licensed Premises. Upon investigation, the officers arrested persons who were in possession of drugs inside the Licensed Premises. This Court acknowledges that the officers did not witness drug sales inside the Licensed Premises on those occasions.

transaction occurred outside, the seller exited the Licensed Premises, made the sale on the sidewalk just outside the Licensed Premises and immediately returned inside the Licensed Premises. Notably, the latter two outside sales occurred in broad daylight. Again, notwithstanding the police activity and/or arrests at or immediately outside the Licensed Premises, and at least one police request to view video footage, neither Li nor any other of Licensee's employees inquired about what was going on.

This Court rejected a corporate licensee's argument that his "limited worldliness and [] blissful ignorance" relieves a licensee of responsibility for unlawful activity on or near its premises, even clandestine drug deals, when such activity is pervasive. *Pa. State Police, Bureau of Liquor Control Enforcement v. Can, Inc.*, 651 A.2d 1160, 1165 (Pa. Cmwlth. 1994). Moreover, "licensees are not permitted to push their problems out the front door and disregard them. Rather, they must monitor what goes on outside and immediately adjacent to their premises as an extension of their operations." *Paey Assocs.*, 78 A.3d at 1200. Based on this Court's review of the instant matter, there was substantial evidence presented to support the trial court's conclusion that Licensee's business was operated such that, in particular, drug activity and public drunkenness were permitted inside or immediately outside in areas under Licensee's control, and was so pervasive that Licensee's principals or employees should have known thereof.

"The [PLCB and/or the trial court] may take into consideration whether any substantial steps were taken to address the activity occurring on or about the premises." 47 P.S. § 4-470(a.1)(4). This Court acknowledges that "[l]icensees are 'not required to do everything possible to prevent criminal activity on the premises, act as their own police force, or close their business.'" *Allison v. Pa. Liquor Control Bd.*, 131 A.3d 1075, 1081 (Pa. Cmwlth. 2016) (quoting *Rosing, Inc. v. Pa. Liquor Control Bd.*, 690 A.2d 758, 762 (Pa. Cmwlth. 1997)). However, substantial affirmative measures should be designed to prevent illegal activity. *See St. Nicholas*.

25

Moreover, "[r]emedial measures must be taken at a time when the licensed establishment knows or should know that illicit activity is occurring on the premises." *I.B.P.O.E. of W. Mount Vernon Lodge 151 v. Pa. Liquor Control Bd.*, 969 A.2d 642, 649 (Pa. Cmwlth. 2009).

Here, despite Licensee's knowledge of the drug activity in the area and discussions with police about the problems stemming from Licensee's operation as early as 2014, public drunkenness and drug activity continued in and around Licensee's establishment. Li testified regarding Licensee's measures to combat the problems as of 2014. Specifically, Licensee's signs warned that such activity would not be tolerated, Licensee hired security, Licensee employed a fairly extensive surveillance and monitoring system, and the area was well-lit. Some time in 2015, Licensee also began using a barred patron list/photos, raised prices, limited purchases and removed the entertainment equipment. Notwithstanding, loitering, public drunkenness and drug activity, even by an employee, continued to occur.

It is apparent based on Li's testimony that although he was apprised of neighborhood complaints about Licensee's operation, and of the neighborhood drug problems, he made only a cursory effort to improve conditions, mostly kept himself in the dark about what was happening, and failed to take even the slightest proactive steps such as inquiring into known illegal activities on or within areas over which he had control. At the Licensed Premises, security doubled as wait-staff and were not dedicated to monitoring the inside and outside of the establishment. When events occurred both inside and outside, neither Li nor Licensee's staff made any effort to find out what happened or who was involved. The mere fact that police regularly entered the premises and removed patrons and, on one occasion, removed and arrested an employee should, at the very least, have triggered Licensee's curiosity, and put Li on notice. In addition, while Licensee's technology allowed Li to monitor the premises at all times, he did not check the cameras unless he was asked to do so.

26

Li also acknowledged that he and the other employees can see outside the Licensed Premises, yet was unaware of most of the incidents about which the Bureau presented evidence.

> There is no magic number or type of incident or span of time that constitutes a pattern of conduct to require the PLCB to refuse to renew a liquor license. . . . [T]he trial court was [] presented with uncontradicted evidence that at least [12] police incidents took place at or near [the Licensed Premises]. Because there was substantial evidence to support the trial court's determination that there was a pattern of illegal conduct at [or near] Licensee's premises sufficient for the PLCB to refuse to renew the License, and there being no abuse of discretion, this Court will not disturb the trial court's order.

*Paey Assocs., Inc.*, 78 A.3d at 1199.

Based on the foregoing, the trial court's order is affirmed.


_____
ANNE E. COVEY, Judge

27

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

York Best Food, LLC            :
t/a Li's Kitchen,                :
             Appellant    :
                       :
        v.            :
                     :   No. 1076 C.D. 2017
Pennsylvania Liquor Control Board  :

## O R D E R

AND NOW, this 11th day of October, 2018, the York County Common Pleas Court's July 11, 2017 order is affirmed.

_____
ANNE E. COVEY, Judge