IN THE COMMONWEALTH COURT OF PENNSYLVANIA

The Gold Room, Inc.                     :
                                        :
       v.                               : No. 1656 C.D. 2019
                                        : ARGUED: November 12, 2020
Pennsylvania Liquor Control Board,      :
                 Appellant              :

BEFORE:    HONORABLE P. KEVIN BROBSON, Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge (P)
           HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CEISLER                              FILED: December 16, 2020

The Pennsylvania Liquor Control Board (Board) appeals from the October 23, 2019 order of the Court of Common Pleas of Delaware County (trial court), which, following a *de novo* hearing, sustained the appeal of The Gold Room, Inc. (Licensee) and reversed the Board's denial of Licensee's application for renewal of its restaurant liquor license (the License). In reversing, the trial court considered the evidence presented at an April 27, 2018 administrative hearing and at hearings held before the trial court on January 24-25, 2019, and concluded that non-renewal of the License was not warranted under Section 470(a.1) of the Liquor Code (Code).[1] After careful review, we reverse.

## I. Background

Licensee operates a restaurant and bar located at 518-520 Edgemont Avenue, Chester, Pennsylvania (the Premises). Reproduced Record (R.R.) at 251a. The License for the Premises is subject to a July 11, 2012 conditional licensing

---

[1] Act of April 12, 1951, P.L. 90, *as amended*, 47 P.S. § 4-470(a.1).

agreement (CLA),[2] which requires, in pertinent part, that Licensee direct one security person to patrol the exterior of the Premises at least once per hour from 9:00 p.m. until one-half hour after closing. R.R. at 250a-51a. Per the CLA, Licensee is required to document, in a log, the time, date, and personnel involved in each patrol. This log is required to be maintained as a business record pursuant to Section 493(12) of the Code, 47 P.S. § 4-493(12).[3] *Id.* at 251a. The CLA further requires that Licensee attend quarterly meetings with the chief, or other designated officer, of the Chester City Police Department (CCPD) to discuss the safe operation of the Premises. *Id.* at 252a. Such meetings are to continue until the CCPD police chief, or his designee, indicates in writing that meetings are no longer necessary. *Id.* Licensee must also maintain records of the date, time, and substance of such meetings pursuant to Section 493(12) of the Code. *Id.* The terms of the CLA are to remain in effect until rescinded by a subsequent agreement. *Id.* at 253a.

By letter dated November 20, 2017, the Board's Bureau of Licensing (Bureau) notified Licensee that its review of the Premises' operations indicated that Licensee may have abused its licensing privilege. R.R. at 237a. The allegations of abuse were based on a September 20, 2010 adjudicated citation for permitting smoking where prohibited and several incidents of disturbances "at or immediately adjacent" to the Premises from December 1, 2015, to the present. *Id.* at 237a, 243a-46a. These

---

[2] A CLA is an agreement between the Board and an applicant that places additional restrictions on the license in question. Section 470(a)(1) of the Code, 47 P.S. § 4-470(a)(1). Such an agreement is binding on the applicant. *Id.* The basis for Licensee's CLA is a September 20, 2010 adjudicated citation for permitting smoking where prohibited on the Premises and 12 incidents of disturbance at or adjacent to the Premises. R.R. at 244a-45a, 248a-49a.

[3] Section 493 of the Code sets forth unlawful acts relative to liquor, malt and brewed beverages, and licenses. 47 P.S. § 4-493. Paragraph 12 of Section 493 makes it unlawful for a licensee to "fail to keep for a period of at least two years" records covering the operation of the licensed business. 47 P.S. § 4-493(12).

2

incidents included "fights, disorderly operations, drugs, shootings, homicide, and assaults." *Id.* at 237a. The Bureau further alleged Licensee's President, Hong T. Huynh (Huynh), and Secretary/Treasurer, Chhoeung V. Ngo (Ngo), may no longer be reputable as required by Sections 102 and 470 of the Code.[4] *Id.* In furtherance of its review, the Bureau sought business records from December 1, 2015, to the present, relating to security patrols of the Premises and meetings held with the CCPD, as required by the CLA. *Id.* at 238a.

By letter dated February 27, 2018, the Bureau reiterated its prior records request and expanded the applicable time frame to include those documents retained from July 11, 2012, to the present. *Id.* at 258a-59a. The Bureau stated that it would presume that any records not received by April 13, 2018, did not exist. *Id.* at 259a. Subsequent correspondence from the Bureau dated April 17, 2018, indicated that it had not received the records sought. *Id.* at 264a.

A hearing on the renewal of the License was held on April 27, 2018. The Bureau called several members of the CCPD to testify as to the alleged incidents of disturbance taking place on the Premises. Licensee presented the testimony of Brian Clore, manager of the Premises, and Licensee's President, Huynh.

### A. Bureau Evidence

### 1. February 2016 Incidents

The Bureau introduced two police reports detailing incidents that took place outside the Premises. The first, dated February 7, 2016, alleged that a verbal altercation took place between bar manager Clore and Roosevelt Turner, an officer

---

[4] Section 102 of the Code defines restaurant in pertinent part as "a reputable place operated by responsible persons of good reputation . . . ." 47 P.S. § 1-102. Section 470(a)(1) of the Code relevantly provides that the Board may deny renewal of a license if the applicant has "by his own act become a person of ill repute . . . ." 47 P.S. § 4-470(a)(1).

with the CCPD. *Id.* at 267a. As a result of this altercation, Clore was charged with terroristic threats, obstructing the administration of law, failure to disperse, and disorderly conduct. *Id.* The second report, dated February 20, 2016, alleged that an individual was observed urinating outside the Premises. *Id.* at 270a. A baggie containing what appeared to be cocaine was found following a search of his person. *Id.*

## 2. May 1, 2016 Incident

Katrina Blackwell, a sergeant with the CCPD, testified that she worked in the vicinity of the Premises during an overnight shift on May 1, 2016. R.R. at 9a-10a. Sergeant Blackwell called dispatch to report a fight after observing "a lot of movement" in the Premises. *Id.* at 11a. She described the atmosphere inside as "chaotic," with approximately 150 people present and several fights taking place. *Id.* at 12a-13a. The patrons involved were "throwing punches and throwing chairs." *Id*. at 12a. Licensee's security personnel attempted to intervene, without success. *Id.* at 13a-14a. Sergeant Blackwell called for additional law enforcement, which resulted in approximately 15 different police departments located within Delaware County responding to the incident. *Id.* at 14a. While clearing patrons from the Premises, Sergeant Blackwell received a call that shots had been fired nearby. *Id.* at 15a. That incident resulted in a homicide, which Sergeant Blackwell later understood took place in a "total[ly] different location" from the Premises. *Id.* at 18a, 26a.

Victor Heness, a detective with the CCPD, investigated the May 1, 2016 homicide, which occurred at the intersection of Fifth Street and City Hall Place. *Id.* at 126a. As part of his investigation, Detective Heness gathered video surveillance

4

recordings from businesses located nearby, including the Premises and a barbershop located on Fifth Street. *Id.* at 127a, 140a.

Footage acquired from the Premises depicted known members of a "specific gang within the city" leaving the Premises at approximately 1:18:45 a.m. *Id.* at 132a, 240a; April 27, 2018 Administrative Hearing, Exhibit B-11. These individuals retrieved guns from their vehicles after leaving the Premises. R.R. at 141a. Shortly thereafter, at 1:20:13 a.m., a fight between two gangs began inside the Premises. *Id.* at 132a, 138a; April 27, 2018 Administrative Hearing, Exhibit B-11. Officers with the CCPD broke up a second fight, which resulted in one arrest. R.R. at 132a. The CCPD did not have enough officers present to effectuate more than one arrest that night. *Id.* at 148a. The victim of the May 1, 2016 homicide, Anthony Moore, was involved in one of the fights. *Id.* at 132a. Detective Heness described the scene inside the Premises as a "complete melee." *Id.* at 145a.

Security equipment from the barbershop on Fifth Street recorded the perpetrators of Moore's murder, the identified known gang members, standing on the corner of Fifth Street and Edgemont Avenue and "wait[ing] for [Moore]" at approximately 1:21:09 a.m.[5] *Id.* at 141a, 143a; April 27, 2018 Administrative Hearing, Exhibit B-11. Moore's homicide was recorded by the barbershop's security equipment at 1:22:31 a.m. *Id.* at 150a; April 27, 2018 Administrative Hearing, Exhibit B-11. The fight inside the Premises was ongoing at that time. R.R. at 144a. Detective Heness testified that between 15 and 20 police cars from neighboring law enforcement agencies arrived to assist with the altercations

---

[5] The time stamp from the barbershop's video footage indicates this took place four hours later, at 5:21 a.m. April 27, 2018 Administrative Hearing, Exhibit B-11. Detective Heness testified that the time stamp for this was off by four hours. R.R. at 140a.

occurring inside the Premises and with the homicide at Fifth Street and City Hall Place. *Id.*

### 3. July 16, 2016 Incident

Jonathon Ross, an officer with the CCPD, responded to a report of shots fired near the Premises on July 16, 2016, at 1:41 a.m. *Id.* at 104a-05a. When Officer Ross arrived at the scene, he observed 20 or 30 people quickly exiting the Premises and other individuals running in the street. *Id.* at 106a. Officer Ross spoke with Licensee's staff, who advised that a fight had taken place and the patrons involved were ejected from the Premises. *Id.* Those individuals walked north after leaving the Premises. *Id.* at 107a, 120a. Shots were fired thereafter. *Id.* at 107a. The CCPD recovered shell casings from a location approximately 25 to 30 yards north of the Premises. *Id.* at 108a, 110a.

Officer Ross did not know the identities of those involved in the shooting or whether they had been patrons of the Premises. *Id.* at 115a. Officer Ross recalled that one patron was injured during the fight inside the Premises, but he refused medical treatment. *Id.* at 108a.

### 4. August 13, 2017 Incident

Merlyn Lee, a captain with the CCPD, testified that she was dispatched to the Premises on August 13, 2017, at approximately 1:30 a.m., for a report of fighting. *Id.* at 32a-33a. When Captain Lee arrived, accompanied by four other officers, she observed many patrons leaving the Premises who appeared to be "riled up," although they were not engaged in a physical confrontation. *Id.* at 33a, 35a. Most of the crowd dispersed, but Captain Lee testified that patrons involved in the fight inside the Premises continued to "mill[] about" and argue with one another.

6

*Id.* at 38a. Captain Lee stated that it was "[n]ot unusual at all" for the CCPD to respond to a call from the Premises around closing time. *Id.* at 33a.

Approximately 10 minutes after Captain Lee arrived, she heard gunfire coming from the south, at a location 40 to 50 yards from the Premises. *Id.* at 39a. Captain Lee identified three victims of the shooting incident as patrons of the Premises. *Id.* at 42a-43a. One victim was armed and he advised Captain Lee that he fired his weapon in retaliation after a friend of his was shot. *Id.* at 65a.

Captain Lee did not know if the shooter had been a patron of the Premises or whether any weapons used in the shooting were inside the Premises prior to the incident. *Id.* at 45a, 62a. A brief video provided by one of Licensee's patrons allegedly showed another patron carrying a gun while inside the Premises; however, Captain Lee could not identify the individual. *Id.* at 57a-58a.

Captain Lee agreed that other businesses, including a boxing gym, the Fifth Street barbershop, and a jazz club, are located within the vicinity of the shooting, which occurred at the intersection of Fifth Street and Edgemont Avenue. *Id.* at 52a, 56a. However, those establishments were not open at the time of the incident. *Id.* at 53a.

## B. Licensee's Evidence

Clore testified that he has managed the Premises since 2015 and he oversees its security and operations. *Id.* at 160a-61a. He works every day from 11:00 a.m. to 2:30 p.m. and 6:00 p.m. to 2:00 a.m. *Id.* at 189a. A metal detector, identification (ID) scanner, and metal detector wand are located at the front entrance to the Premises. *Id.* at 165a. Patrons must pass through the metal detector prior to entering the building. *Id.* at 166a. These security measures have existed since the Premises opened. *Id.* IDs are scanned at the front entrance after 9:00 p.m. *Id.* at 196a. Prior

to that time, IDs are checked at the bar. *Id.* Male patrons are patted down and female patrons are "wanded." *Id.* at 167a. During the week, Licensee employs four security personnel, one stationed near the bathroom and three roaming the floor. *Id.* at 168a. On Fridays and Saturdays, Licensee employs two armed security guards in addition to the regular security personnel. *Id.* One of Licensee's security personnel patrols the perimeter outside the Premises every hour to make sure "everything is calm." *Id.* at 180a, 193a.

Clore acknowledged that he is aware of the CLA's terms. *Id.* at 206a. He discusses the Premises' security measures with the CCPD Commissioner, Otis Blair, once a month. *Id.* at 185a, 204a. These discussions take place by telephone, unless a "dire need" arises to discuss matters in person. *Id.* at 204a. As a result of these meetings, Licensee has an arrangement with the CCPD to provide police assistance at closing time. *Id.* at 186a. Commissioner Blair has not lodged any complaints about the Premises with Clore. *Id.* Licensee provides law enforcement access to its security footage when requested. *Id.* at 174a.

Clore admitted that fights have taken place inside the Premises but he advised that Licensee bans the patrons involved. *Id.* at 171a, 173a. Banned patrons are identified through photos taken by the front door security cameras and kept in a folder by the security station at the front entrance. *Id.* at 198a-99a. The security equipment on the Premises consists of 64 cameras on the inside of the Premises, 7 cameras outside at the front of the building, and 4 cameras in the rear. *Id.* at 202a. A digital video recorder (DVR) stores surveillance footage, which is recorded "24/7." *Id.* If a fight occurs on the Premises, one of Licensee's employees calls the police from the kitchen. *Id.* at 169a-70a. The purpose of this policy is to "get the

8

police out front," so that any ejected patrons will "act accordingly because the police are there." *Id.* at 170a.

Huynh is the president of Licensee and its sole owner. *Id.* at 225a, 228a. Huynh's husband, Ngo, transferred his shares of Licensee to her in November 2017. *Id.* at 228a.

### C. Bureau Recommendation and Board Decision

Having reviewed the evidence presented by the parties, the hearing examiner agreed with the Bureau that Licensee had abused its licensing privilege. *Id.* at 371a. This conclusion was based on a finding of disorderly operations in and outside the Premises, which the hearing examiner attributed to owners Huynh and Ngo, whom the hearing examiner deemed no longer reputable. *Id.* at 371a-72a. The hearing examiner also found that Licensee failed to produce business records related to security patrols made on the Premises and meetings held with the CCPD. *Id.* at 372a. The hearing examiner recommended that the License be renewed, placed in safekeeping, and sold to a bona fide third party. *Id.*

The Board disagreed with the hearing examiner's recommendation and denied Licensee's renewal application. Bd. op. at 33. The Board opined that Licensee's adjudicated citation from 2010 alone demonstrated an abuse of the License and an unwillingness to comply with the Code and/or Board regulations. *Id.* at 25. The Board was further troubled by the charges filed against Clore, which involved a verbal altercation with a CCPD police officer. *Id.* at 27. The Board found it problematic that Licensee "permitted" an intoxicated individual to urinate outside the Premises. *Id.* Moreover, despite Licensee's employment of security personnel, violent incidents continued to occur within and outside the Premises. *Id.* Licensee's

9

failure to provide the business records requested by the Bureau violated the terms of the CLA. *Id.* at 29.

Additionally, Licensee's failure to notify the Board that Ngo's ownership interest in Licensee transferred to Huynh, as required by Section 5.91(a) of the Board's regulations,[6] demonstrated Licensee's failure to operate the Premises within the requirements of the Code and the Board's regulations. *Id.* at 32. Finally, the Board deemed Huynh and Ngo to be no longer reputable, as they were ultimately responsible for the Premises and failed to implement sufficient and timely corrective measures to address problems with its operations. *Id.* at 33.

Licensee appealed to the trial court, which heard the matter *de novo*, and took additional evidence at hearings held on January 24-25, 2019.

### D. Trial Court Evidence

Clore reiterated his prior testimony regarding security equipment and procedures implemented at the Premises. R.R. at 379a-87a. He further testified that security patrols are detailed in a logbook, which is also used to document the security personnel working on a given evening as well as any incidents that take place on the Premises. R.R. at 387a. *Id.* Clore indicated that "there has always been a logbook" on the Premises. *Id.* at 411a. Licensee introduced a logbook documenting security patrols that occurred after the April 27, 2018 administrative hearing. *Id.* at 392a.[7]

---

[6] Section 5.91(a) of the Board's regulations requires that any change in a licensee's officers, directors, or stockholders be reported to the Board within 15 days. 40 Pa. Code § 5.91(a).

[7] The Board objected to the introduction of the logbook as irrelevant. R.R. at 388a. The trial court accepted the document but made it clear that only remedial measures taken prior to the April 27, 2018 administrative hearing would be considered. *Id.* at 391a-92a.

10

Huynh testified that she has never been arrested or charged with any criminal offense. *Id.* at 427a. Her husband, Ngo, does not hold any position or office for Licensee. *Id.* at 426a.

Cyphodeen Simpson, a paralegal for Licensee's counsel, testified that he attempted to file documents relating to the transfer of Ngo's interest in Licensee to Huynh. *Id.* at 431a. The Board's electronic filing system would not allow Simpson to complete the filing, however, as the License was under review and not "active." *Id.* at 431a-33a. Simpson did file the relevant documents with the Pennsylvania Department of Revenue. *Id.* at 436a.

CCPD Commissioner Blair confirmed that, during the period from 2015 to 2018, he met with Clore to discuss the safety of Licensee's patrons. *Id.* at 461a. Commissioner Blair stated that Licensee's management and security personnel were cooperative with the CCPD "99.9 percent of the time," and they complied with the CCPD's security recommendations "99 percent of the time." *Id.* at 461a, 492a. These recommendations concerned "various topics at various time[s]," and included methods for improving the control of patrons entering and exiting the Premises. *Id.* at 491a. Commissioner Blair instructed his officers, if available while on duty between 1:30 a.m. and 2:00 a.m., to assist Licensee with crowd control and traffic flow and to act "as a deterrent." *Id.* at 491a, 498a. Commissioner Blair testified that he took such action earlier in his career as a captain and sergeant "when [the Premises] first opened [its] doors." *Id.* at 499a.

Commissioner Blair described the crime scene from the May 1, 2016 homicide as a "very large area" that extended away from the Premises, up the street several thousand feet, and around a corner. *Id.* at 484a, 489a-90a.

11

In an order dated October 23, 2019, the trial court reversed the Board's decision to not renew the License. The trial court found Clore's testimony before the trial court to be credible and consistent with his testimony before the hearing examiner; the additional witnesses who testified on January 24-25, 2019, Commissioner Blair, Huynh, and Simpson, were also deemed credible. Trial Ct. Finding of Fact (F.F.) Nos. 32-33.

With regard to the February 7, 2016 arrest of Clore by Officer Turner, the trial court noted that docket entries of the incident reflected that all charges against Clore were dismissed. Trial Ct. op. at 34. The trial court concluded that no causal connection existed between Licensee and the February 20, 2016 incident involving a person urinating outside the Premises, as the record failed to demonstrate that the individual was a patron of the Premises. *Id.* at 35.

The trial court acknowledged that an altercation took place inside the Premises on May 1, 2016, the same night as the homicide at Fifth Street and City Hall Place, approximately a block and a half from the Premises. Trial Ct. op. at 35. Licensee's security personnel assisted the police to stop the fighting and disperse the patrons inside the Premises, and Clore fully cooperated with the CCPD in providing access to its video surveillance footage. *Id.* The trial court concluded that the record failed to demonstrate that weapons or illegal drugs were found on the Premises the night of the fight and used in commission of the homicide. *Id.*

The July 16, 2016 incident involved a report of shots fired. *Id.* Licensee's security personnel notified Officer Ross, the CCPD officer responding to the incident, that a fight had taken place inside the Premises and the patrons involved were ejected. *Id.* at 35-36. The CCPD found shell casings approximately 30 yards from the Premises. *Id.* at 36. The trial court concluded that, as with the May 1, 2016

incident, nothing in the record suggested that any guns, illegal drugs, or other weapons were found on the Premises and used in the shooting that took place at a separate location. *Id.*

The trial court noted that the August 13, 2017 incident involved a fight inside the Premises. *Id.* Captain Lee, the officer responding to the report, observed patrons arguing outside the Premises but she did not witness any fighting. *Id.* Licensee's security personnel assisted the police in removing patrons from the Premises. *Id.* While outside the Premises, Captain Lee heard shots fired approximately 40 to 50 meters away. *Id.* Three of the shooting victims had been patrons of the Premises, one of whom was armed. *Id.* Captain Lee did not know, however, if any of the weapons used were in the Premises prior to the shooting incident. *Id.* She could not identify the shooter and bullets recovered from the crime scene were not fired by the injured patron. *Id.* at 36-37. The trial court again found that the evidence did not establish a causal connection between the shooting and the Premises. *Id.* at 37.

Based on the above analysis, the trial court found that the incidents of disturbance cited by the Board were not connected with, or attributable to, Licensee's business, and as such, were insufficient to justify non-renewal of the License. F.F. No. 40.

The trial court recognized that neither Licensee nor its employees had the authority to control the flow of traffic on the public streets surrounding the Premises. *Id.* at 37. Despite this, Licensee's security personnel made perimeter checks up and down the block outside the Premises. *Id.* Commissioner Blair credibly testified that he met with Clore from 2015-2018 to discuss security measures for the Premises and Licensee's security cooperated with the CCPD "99.9%" of the time. *Id.* at 38. The trial court acknowledged that criminal activity occurs in the area in which the

13

Premises is located; however, Licensee has made a "zealous effort" to keep its patrons and the public safe. *Id.* The trial court opined that, other than close its business, Licensee "has done what it can to accomplish this goal." *Id.* at 38-39. Accordingly, the trial court concluded, the evidence supported a conclusion that Licensee took substantial steps to prevent criminal activity on the Premises.

Regarding the CLA, the trial court determined that non-renewal of the License was not warranted where the evidence demonstrated that Licensee substantially complied with its terms and conditions and any violations thereof were *de minimis.*

Lastly, the trial court concluded that the evidence did not support a finding that Huynh was not reputable, as she credibly testified that she had not been arrested or charged with any criminal offense and her husband was no longer an officer of Licensee. The trial court incorporated its prior analysis of the alleged incidents of disturbance to the extent they related to the Board's finding that Huynh was not reputable. This appeal followed.[8]

## II. Issues

On appeal, the Board argues that the trial court erred in finding that the incidents of disturbance were not connected to Licensee's business; in determining that Licensee took timely and remedial measures to prevent unlawful activity on the Premises; and in concluding that Licensee's failure to comply with the CLA was *de minimis* and did not warrant a non-renewal of its license.

---

[8] This Court's scope of review in a liquor license renewal case is limited to a determination of whether the trial court's findings of fact are supported by substantial evidence and whether the trial court committed an error of law or abused its discretion. *I.B.P.O.E. of W. Mt. Vernon Lodge v. Pa. Liquor Control Bd.*, 969 A.2d 642, 647 n.6 (Pa. Cmwlth. 2009). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Rosing, Inc. v. Pa. Liquor Control Bd.*, 690 A.2d 758, 760 (Pa. Cmwlth. 1997), *overruled on other grounds, Pa. Liquor Control Bd. v. Richard E. Craft Am. Legion Home Corp.*, 718 A.2d 276, 278 (Pa. 1998).

14

### III.   Analysis

### A. Incidents of Disturbance

First, we review whether the trial court erred when it found that the incidents of disturbance cited by the Board were not chargeable, connected, attributable, or tied to Licensee's business, and that they were insufficient to justify non-renewal of the License.

The renewal of a liquor license is discretionary. *S & B Rest., Inc. v. Pa. Liquor Control Bd.*, 114 A.3d 1106, 1110 (Pa. Cmwlth. 2015). Section 470(a.1)(4) of the Code relevantly provides that the Board may refuse to renew a license:

> (4) due to the manner in which this or another licensed premises was operated while the licensee, its shareholders, directors, officers, association members, servants, agents or employes were involved with that license. When considering the manner in which this or another licensed premises was being operated, the board may consider activity that occurred on or about the licensed premises or in areas under the licensee's control if the activity occurred when the premises was open for operation and if there was a relationship between the activity outside the premises and the manner in which the licensed premises was operated. The board may take into consideration whether any substantial steps were taken to address the activity occurring on or about the premises.

47 P.S. § 4-470(a.1)(4).

When an appeal is taken from a decision of the Board, the trial court hears the matter *de novo*. Section 464 of the Code, 47 P.S. § 4-464. The trial court may make its own findings, and reach its own conclusions based upon those findings, even when the evidence it hears is substantially the same as the evidence presented to the Board. *Two Sophia's, Inc. v. Pa. Liquor Control Bd.*, 799 A.2d 917, 919 (Pa.

15

Cmwlth. 2002). The trial court is free to substitute its discretion for that of the Board and it may modify, sustain, or reverse a Board decision to deny the license renewal, even if there is substantial evidence to support the Board's findings. *Goodfellas, Inc. v. Pa. Liquor Control Bd.*, 921 A.2d 559, 566 (Pa. Cmwlth. 2007); *Two Sophia's, Inc.*, 799 A.2d at 921.

Licensees are held strictly liable for violations of the Code that occur on the licensed premises. *Pa. Liquor Control Bd. v. TLK, Inc.*, 544 A.2d 931, 933 (Pa. 1988). Licensees are also held accountable for activity occurring off-premises where there is a causal connection between the licensed premises and the activity. *St. Nicholas Greek Cath. Russian Aid Soc'y v. Pa. Liquor Control Bd.*, 41 A.3d 953, 958 (Pa. Cmwlth. 2012). Criminal activity will support a license revocation where the activity can be attributed to the manner by which the licensed premises is operated. *Allison v. Pa. Liquor Control Bd.*, 131 A.3d 1075, 1080 (Pa. Cmwlth. 2016). The Board may refuse to renew a license where the licensee (1) knows, or should have known, of ongoing criminal activity, and (2) failed to take "substantial affirmative steps to prevent such activity." *TLK, Inc.*, 544 A.2d at 933.

A licensee is not required to "do everything possible to prevent criminal activity on the premises, act as [its] own police force, or close [its] business." *Rosing*, 690 A.2d at 762-63. It is only required to take "substantial affirmative measures to prevent the misconduct." *Id.* at 763. Such steps must be taken, however, at a time when the licensed establishment knows or should know that illicit activity is taking place on the premises. *I.B.P.O.E.*, 969 A.2d at 650.

The Board maintains that the incidents which occurred on May 1, 2016, July 16, 2016, and August 13, 2017, are causally linked to the operation of Licensee's

16

business and are sufficient grounds to deny Licensee's renewal application,[9] and the trial court misapplied the relevant case law when it concluded otherwise. The Board argues that the trial court failed to afford the proper legal significance to these incidents, which indisputably began on the Premises and required the intervention of law enforcement. The uncontested evidence established that all three shootings involved Licensee's patrons and occurred in the immediate vicinity of the Premises at a time when no other businesses were open. The Board contends that, even if the shootings that occurred off-premises are discounted, the fights inside the Premises that took place beforehand required the intervention of law enforcement. In support of its challenge to the trial court's conclusions, the Board cites this Court's decisions in *St. Nicholas* and *I.B.P.O.E.*

In *St. Nicholas*, this Court affirmed a trial court's decision to affirm the Board's denial of a licensee's renewal application. The Board's denial was based in part on several incidents of misconduct, including an assault with a weapon, several fights, one involving an attack on a police officer, and a stabbing, all of which occurred on the licensed premises. This Court rejected the licensee's argument that the incidents were not causally related to the manner in which the premises was operated, as they took place in an area under the licensee's control, during or shortly after the licensee's hours of operation, and involved licensee's customers who had been drinking inside the licensed premises.

The incidents which led to the Board's non-renewal of the license in *I.B.P.O.E* included an assault inside the licensed premises, an argument initiated inside the premises which escalated and led to a shooting directly outside, and an episode in

---

[9] The Board has not challenged the trial court's dismissal of the February 7, 2016 and February 20, 2016 incidents as unrelated to Licensee's operation of the Premises, or questioned the trial court's conclusions with regard to the reputations of Huynh and Ngo.

which a patron pointed a gun at the licensee's bartender. The trial court reversed the Board's non-renewal of the license after considering remedial measures taken by the licensee. This Court reversed after our review of the record failed to reveal what affirmative measures were employed.

While our decisions in *St. Nicholas* and *I.B.P.O.E.* are certainly instructive, the facts are somewhat distinguishable, as the shootings involved in the present matter took place in areas that were not within Licensee's control. The May 1, 2016 homicide, for example, was not captured by Licensee's video surveillance equipment. Rather, that evidence came from the security cameras installed at a barbershop located on another street approximately one block away from the Premises. Furthermore, the time stamps on the relevant video surveillance footage indicates that the perpetrators of the May 1, 2016 homicide left the Premises a few minutes before the fight broke out.

While Captain Lee testified to a video which purported to show one of Licensee's patrons armed with a gun while inside the Premises on August 13, 2017, Captain Lee could not identify the patron, and the Board presented no evidence that weapons were found on the Premises and used in the August 13, 2017 shooting that took place 40 to 50 yards to the south. Furthermore, there is no evidence to suggest that the July 16, 2016, and August 13, 2017 shootings were committed by any of Licensee's patrons.

This conclusion does not end our analysis, however, as the Board's decision to deny Licensee's renewal application was in part predicated on the violent incidents that occurred *inside* the Premises, despite the presence of security personnel. Conspicuously absent from the trial court's discussion is any consideration of whether the verbal and physical altercations taking place inside the

18

Premises, and which precipitated the off-premises shootings, were sufficient to justify non-renewal of the License.

In *White House Cafe, Inc. v. Pennsylvania Liquor Control Board* (Pa. Cmwlth., No. 850 C.D. 2011, filed April 23, 2012), 2012 WL 8681520, an unreported opinion of this Court,[10] we affirmed the denial of a liquor license renewal application based on homicides that took place adjacent to the licensed premises in 2006 and 2007. We agreed with the trial court's decision to not renew the license, as the *licensee was on notice that the premises attracted patrons who resolved their disputes with weapons*. Slip op. at 7. The 2007 homicide was precipitated by a "brawl" that took place inside the premises. Evidence of the homicide's proximity to the premises, its occurrence soon after the feuding patrons were ejected from the bar, and the "inadequate efforts to separate the feuding patrons," supported a finding that the homicide was connected to the licensee's operation of the premises. *Id.* at 7. We agreed with the Board that the licensee could not simply "put its problems out on the street" by ejecting its patrons after a fight and then "wash its hands of those problems." *Id.*

We further noted the licensed premises' location within a high-crime area. *Id.* at 8. The licensee knew that her mailman wore a bullet-proof vest and she took several steps to increase security after a 2005 assault which occurred inside the licensed premises. *Id.* Accordingly, as the licensee was aware of ongoing criminal activity, the burden shifted to her to show she made substantial and affirmative steps to guard against a known pattern of illegal activity. *Id.* Although the licensee took efforts to improve security on the premises, they did not deter the 2006 and 2007

---

[10] This Court's unreported memorandum opinions may be cited for their persuasive value. Section 414(a) of the Commonwealth Court's Internal Operating Procedures. 210 Pa. Code § 69.414(a).

homicides. *Id.* at 9. In light of the magnitude of the risk, "the repetition of death and serious bodily injury," we agreed with the trial court that the licensee's efforts were not substantial enough to "deter further bloodshed." *Id.*

In the instant matter, while the perpetrators of the off-premises shootings on July 16, 2016, and August 13, 2017, cannot be tied to Licensee's patrons, the same cannot be said of the May 1, 2016 homicide. The victim, Moore, was a patron involved in one of the altercations that took place inside the Premises, and the perpetrators (known gang members) were also Licensee's patrons.

Detective Heness described the May 1, 2016 incident as a "complete melee," which consisted of multiple fights involving patrons who physically assaulted each other with their fists and with chairs. R.R. at 145a. This incident necessitated a county-wide police response involving 15 law enforcement agencies. Captain Lee testified that it was "[n]ot at all unusual" for the CCPD to respond to calls from the Premises at closing time. *Id.* at 33a. Police response by the CCPD was also required for the July 16, 2016 and August 13, 2017 fights. Clore acknowledged that he contacted law enforcement when fights broke out in the hopes that Licensee's patrons would "act accordingly" after being ejected from the Premises. *Id.* at 170a. Such a policy demonstrates Licensee's inability to prevent criminal activity on the Premises without the intervention of law enforcement. Indeed, it suggests that Licensee, rather than take affirmative steps to prevent violence from erupting inside the Premises, relies on the CCPD to contain it after the fact. Like the proprietor in *White House Café*, Licensee cannot simply wash its hands of the patrons it ejects once they leave the Premises and rely on the CCPD to remedy any situation that follows.

20

There is no dispute that the May 1, 2016, July 16, 2016, and August 13, 2017 altercations involved Licensee's customers, they took place in an area under Licensee's control, and they occurred during Licensee's hours of operation. In that regard, the trial court's dismissal of the altercations as unrelated to Licensee's business is simply not sustainable. Accordingly, we agree with the Board that the trial court erred in finding that the May 1, 2016, July 16, 2016, and August 13, 2017 altercations were not connected to Licensee's operation of the Premises.

## B. Remedial Measures

Next, we address the Board's argument that the trial court erred in concluding that Licensee implemented timely and substantial remedial measures in response to the incidents of violence occurring on the Premises.

The Board argues that the trial court, in concluding that Licensee "took substantial remedial measures to resolve incidents of misconduct in violation of the [Code] and to protect its patrons and the public," improperly considered security measures employed on the Premises, which were put in place at the time the Premises opened and existed long before the May 1, 2016, July 16, 2016, and August 13, 2017 incidents. Trial Ct. op. at 37. The Board maintains that the evidence instead demonstrates that Licensee took no action whatsoever in response to those incidents.

For non-Code related violations of law, including the Crimes Code,[11] the Board may refuse to renew a license where the licensee (1) knows or should have known of ongoing criminal activity and (2) failed to take substantial affirmative steps to prevent such activities. *TLK, Inc.*, 544 A.2d at 933. A licensee may defend its license by demonstrating that it took substantial affirmative steps to guard against

_____

[11] 18 Pa.C.S. §§ 101 – 9546.

a known pattern of illegal activities. *Id.* Remedial measures must be taken when the licensed establishment knows, or should know, that illicit activity is taking place on the premises. *I.B.P.O.E.*, 969 A.2d at 650.

The Board is correct that the security measures Licensee employed, including the use of metal detectors, video surveillance, and security patrols, all existed prior to the incidents at issue. While Clore met with Commissioner Blair to discuss the safe operation of the Premises, these meetings were required by the terms of the CLA and demonstrated Licensee's compliance therewith, nothing more. Commissioner Blair testified that he made recommendations to Clore during discussions that took place between 2015 and 2018; however, such recommendations related to the traffic flow of patrons entering the Premises and cars parked on the streets outside. There is no evidence to suggest these recommendations were intended to address and rectify the issues which led to the May 1, 2016, July 16, 2016, and August 13, 2017 altercations. Licensee has not argued it was unaware of the fights taking place on the Premises (nor could it). There is no evidence demonstrating that Licensee took *any action whatsoever* following the May 1, 2016 melee, or the fights that took place in the months and year afterward.

Based on our review of the record, we simply cannot agree that Licensee implemented substantial affirmative steps to guard against a known pattern of illegal activities. *TLK, Inc.*, 544 A.2d at 933. Accordingly, we conclude that the trial court's determination that Licensee took substantial steps to prevent criminal activity on the Premises is not supported by substantial evidence.

## C. Violation of the CLA

Finally, we address whether the trial court erred in concluding that Licensee's violation of the CLA was *de minimis* and did not warrant the Board's non-renewal of the license.

Section 470(a) of the Code provides that:

> [t]he [B]oard may enter into an agreement with the applicant concerning additional restrictions on the license in question. If the [B]oard and the applicant enter into such an agreement, such agreement shall be binding on the applicant. ***Failure by the applicant to adhere to the agreement will be sufficient cause to form the basis for a citation under section 471 and for the nonrenewal of the license under this section***.

47 P.S. § 4-470(a) (emphasis added). It is clear, therefore, that a licensee's breach of its CLA may establish a basis for non-renewal of a license. *See Hotel Liquor License #H-2892 v. Tabs Entm't, Inc.*, 125 A.3d 487, 492 (Pa. Cmwlth. 2015) (licensee's failure to comply with requirements of a CLA sufficient cause for non-renewal of license).

The trial court concluded that Licensee "substantially complied" with the terms and conditions of the CLA based on a logbook introduced at the January 24, 2019 trial court hearing, which documented security patrols performed at the Premises after April 27, 2018. Trial Ct. op. at 40. The trial court was also persuaded by the security measures implemented on the Premises. *Id.*

The Board notes that Licensee presented no evidence demonstrating it kept records of meetings held with the CCPD or security patrols made prior to April 27, 2018. Licensee failed to produce any records whatsoever from the period of July 11, 2012, through February 27, 2018, the date of the Bureau's second records

request. The Board maintains that Licensee's failure to document the security patrols and meetings with the CCPD is a material breach of the July 11, 2012 CLA, as the CLA's record-keeping requirements are necessary to ensure compliance with its substantive provisions. The Board argues that such non-compliance evidences a careless disregard of Licensee's obligations.

As to that failure, we agree with the Board that Licensee's failure to comply with the terms of the CLA relating to record retention constitutes a material breach thereof. Clore admitted that he was aware of the terms of the CLA. While Clore testified that "there has always been a logbook," R.R. at 411a, he provided no specifics as to what those logbooks contained and Licensee presented no physical evidence to show that it documented security patrols occurring *prior to* the April 27, 2018 administrative hearing. Licensee's compliance with the record retention provision of the CLA *after* April 27, 2018, as evidenced by the logbook introduced at the January 24, 2019 trial court hearing, does not excuse its previous six-year period of apparent non-compliance.

The relevant provisions of the CLA requires that Licensee must not only document its security patrols and meetings with the CCPD, it must also maintain the records for a period of at least two years. Licensee indisputably failed to produce the records when requested by the Bureau and it made no attempt to explain why the records were not provided. Furthermore, Licensee provided no testimony or documentary evidence whatsoever to demonstrate that it ever maintained records relating to monthly meetings held with members of the CCPD. Dismissing Licensee's failure to comply *at any time* with one of the CLA's terms as a *de minimis* breach would effectively render it a nullity. We decline to do so and the trial court erred in concluding otherwise.

24

## IV. Conclusion

The record demonstrates that the verbal and physical altercations which precipitated the May 1, 2016, July 16, 2016, and August 13, 2017 off-premises shootings are connected to Licensee's operation of the Premises. As the record is devoid of any facts to support a conclusion that Licensee took remedial steps to prevent future criminal activity, the trial court erred in reversing the Board's decision to not renew the License. The trial court further erred in concluding that Licensee's breach of the CLA's terms was *de minimis.* Accordingly, we reverse the trial court.

_____
ELLEN CEISLER, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

The Gold Room, Inc.                    :
                                       :
          v.                           :   No. 1656 C.D. 2019
                                       :
Pennsylvania Liquor Control Board,     :
               Appellant               :

# **O R D E R**

AND NOW, this 16th day of December, 2020, the order of the Court of Common Pleas of Delaware County dated October 23, 2019, is hereby REVERSED.

_____
ELLEN CEISLER, Judge